## Richmond

THURMOND ROBERT McCOY v. COMMONWEALTH OF VIRGINIA.

October 11, 1965.

Record No. 6072.

Present, All the Justices.

*Harold B. Singleton*, for the plaintiff in error.

*D. Gardiner Tyler, Assistant Attorney General (Robert Y. Button, Attorney General*, on brief), for the Commonwealth.

CARRICO, J., delivered the opinion of the court.

Thurman Robert McCoy, the defendant, was indicted by the grand jury for having carnal knowledge of Peggy Ann Tyree, a female

child thirteen years of age. He was also indicted for having carnal knowledge of Brenda Wood, eleven years of age. (Code, § 18.1-44).

By consent of the defendant and the Commonwealth's Attorney and with the concurrence of the court, the two indictments were consolidated for trial. A jury trial was held. The defendant's motions to strike the evidence were overruled, although the court submitted the indictment involving Brenda Wood to the jury upon a charge of attempted rape only.

The defendant was found not guilty of the attempted rape of Brenda Wood. He was, however, found guilty of the rape of Peggy Ann Tyree and his punishment was fixed by the jury at ten years in the penitentiary. That sentence was imposed by the trial court and from the final order of the court the defendant was granted a writ of error.

The defendant has been represented throughout these proceedings by Harold B. Singleton, court-appointed counsel, who ably defended him in the court below and who has diligently prosecuted his appeal in this court.

Most of the evidence presented by the Commonwealth found no conflict with that presented by the defendant.

The record shows that the defendant, who was twenty-seven years of age, was acquainted with Peggy Ann Tyree and Brenda Wood as the result of their visits to the filling station in the city of Lynchburg where he was employed.

Peggy Ann and Brenda lived with their parents in a trailer park in Campbell County near Lynchburg. On the evening of October 26, 1963, the two girls left their homes to attend a Halloween party at a church in the city. On their arrival at the church, they found no party in progress, and so they walked across town to a diner. At the diner, they met two boys who took them for a ride in an automobile. Some time later, the four young people were found by a policeman sitting in the parked automobile in a "no trespassing" area. The officer ordered the occupants of the vehicle to move on and told the girls to go home. The boys then drove the girls to the trailer park in which their homes were located.

Peggy Ann and Brenda were afraid their mothers "was going to beat [them] or something," and so, instead of entering their homes, they decided to run away. The two girls left the trailer park on foot and were walking eastwardly on the highway toward Lynchburg at 1:45 a.m., when the defendant approached in his automobile from the opposite direction.

The defendant recognized the girls as he passed them. He turned his vehicle around and returned and offered them a ride. They told him that they had been out with two boys earlier in the evening; that the police had ordered them to go home, and that they were running away. The defendant told the two girls that he "would take [them] somewhere where the cops couldn't get [them]."

Peggy Ann and Brenda joined the defendant in his automobile and he drove them to his home, situated in an isolated area on Candler's Mountain in Campbell County. The three entered the house and, at the defendant's direction, the girls lay down on a settee or couch which was opened "like a bed." The defendant then lay down between the two girls, as he explained, "to keep them warm."

It is here that the stories of the two girls and that of the defendant, concerning the bizarre occurrences which then took place, fall into hopeless divergence. The defendant testified that after he lay down between Peggy Ann and Brenda, he "hadn't any more than laid down and I went to sleep." He denied that he "touched either one" of the girls.

Peggy Ann, however, testified that while "we were laying on the sofa . . . he got to fooling around with me and then finally he moved from me because I was fighting him and he started messing around with Brenda the same way and she took and started fighting him and he came back over and had relations with me. Then he tried to have relations with Brenda and Brenda told him to stop, it hurt, and then after that he went to sleep." Peggy Ann testified in detail as to the actions of the defendant in having "relations" with her, including the essential element of penetration.

Brenda testified that "we got on the couch and covered up with the quilt and he came in and got in the middle of us and laid down . . . and all of a sudden I heard him turn over and everything and he was trying to have relations with Peggy Tyree . . . After he had it with her he had it with me and had it with her and had it with me again." Brenda explained that the defendant's "relations" with her were unsuccessful; that he "tried to have relations with [me] twice" but "he wasn't able," and that when she told him "it hurt he stopped."

The next morning, October 27, the three arose at approximately seven o'clock and the defendant drove the two girls into Lynchburg and let them out of his automobile.

The girls spent the morning walking around the city. In the afternoon, they met two boys with whom Peggy Ann was acquainted and

rode in an automobile with them. After they left the boys, the two girls spent some time in a park in the city. At approximately ten o'clock that evening, Peggy Ann and Brenda were observed by a state trooper walking along a road toward their homes. He picked them up and delivered them to their parents. It was then that each girl complained to her mother about the defendant's actions of the night before.

Warrants were obtained for the defendant and he was arrested. Upon interrogation by the police, the defendant orally and in a written statement admitted that he had had sexual intercourse with Peggy Ann. When he was asked if he had had sexual intercourse with Brenda, he replied, "No, sir, I really didn't; [I] was leading up to it, but it never happened."

The defendant first contends that the trial court erred when it admitted his written confession into evidence. This was error, the defendant argues, because the confession was not made voluntarily but because of the promise by the investigating police officer of lighter punishment.

Out of the presence of the jury, the trial court conducted a hearing to determine the admissibility of the confession and to act upon the defendant's objection to such admission. The state police investigator who took the confession and the defendant were examined at length as to the circumstances surrounding the giving and the signing of the confession.

The investigator testified that before the defendant made his confession, he was advised that he had the right to talk to an attorney; that any statement he made "may be used in a court of law as evidence for or against him and I told him I didn't want him to do or to say anything that he didn't want to do." The investigator denied flatly that the defendant was given "any promise of reward or any promise . . . that he would get a lighter sentence or get off easier" if he confessed.

The defendant testified that he confessed only because the investigator "explained how him and the sheriff always made recommendations to the judge which the judge usually went along with." The defendant further stated that he was told by the investigator that the sheriff "agrees if you make out a statement we will give recommendations" and "if the recommendation came through I would probably get off with a suspended sentence."

At the conclusion of the out-of-court hearing, the court ruled that

the confession "was voluntarily given without duress or any promise" and ordered that it be admitted into evidence.

It is without dispute that in Virginia the burden is upon the Commonwealth to prove that a confession is voluntary. *Ward* v. *Commonwealth*, 205 Va. 564, 571, 138 S. E. 2d 293; *Campbell* v. *Commonwealth*, 194 Va. 825, 830, 75 S. E. 2d 468. That burden is carried when the Commonwealth presents credible evidence to show that the confession was made under circumstances free of coercion and duress and untainted by promises of reward or leniency. *Campbell* v. *Commonwealth*, *supra*, 194 Va., at p. 830; *James* v. *Commonwealth*, 192 Va. 713, 718, 66 S. E. 2d 513.

Here, the evidence of the Commonwealth, presented in the out-of-court hearing, was amply sufficient to show that the defendant confessed voluntarily. The defendant's story that he was promised leniency in return for his confession merely raised, at best, a controverted issue of fact. That issue was for the trial court to determine and it cannot be said to have erred in accepting that version of the evidence which proved that no promise of leniency was made to the defendant. *Reid* v. *Commonwealth*, Record No. 6130, this day decided; *Jackson* v. *Commonwealth*, 193 Va. 664, 673, 70 S. E. 2d 322; *Omohundro* v. *Commonwealth*, 138 Va. 854, 864, 121 S. E. 908.

In his brief and in argument before us, the defendant contended that the written confession showed on its face that it was not voluntary. He directs our attention to a question and answer set forth in the confession which he says "shows that some outside offer or promise had been made . . . to get him to confess." The question and answer were in the following language:

"Q. Why are you making this statement?

"A. Mostly because of the little talk that we had, and I came to the conclusion that it was the right thing to do."

Two propositions afford sufficient answer to this contention. In the first place, the trial court inquired fully into the "little talk" between the investigator and the defendant and found nothing therein destructive of the voluntary nature of the confession. We see no reason to disturb that ruling. Secondly, when the face of the confession is resorted to, it shows the following question and answer immediately preceding the language upon which the defendant relies:

"Q. Has anyone here told you that the Courts would deal more leniently with you, if you confessed to this crime?

"A. No, sir."

The record conclusively shows that before he confessed, the defendant had been arrested upon a valid warrant; that he was told that he could talk with an attorney; that he was informed that he could remain silent, and that he was advised that any statement which he made could be used against him in court. In the face of these warnings, in a situation where the defendant, according to undisputed evidence, "seemed to understand everything," the confession was freely and voluntarily given. Its introduction into evidence, under such circumstances, violated no established principles of due process of law. *Escobedo* v. *Illinois*, 378 U. S. 478, 12 L. ed. 2d 977, 986, 84 S. Ct. 1758.

As corollary to his contention concerning the admissibility of the confession, the defendant asserts that the court erred in refusing to permit the jury to pass upon such admissibility. In this connection, the defendant offered instruction A,[1] which was refused by the court.

The refused instruction would have, in effect, told the jury that it was to determine the issue of the admissibility of the confession and, if it believed that the confession was not voluntary, to reject it as evidence.

The respective roles of the court and jury with regard to confessions are well established in this Commonwealth and were best delineated by Mr. Justice Spratley in *Upshur* v. *Commonwealth*, 170 Va. 649, 655, 197 S. E. 435, as follows:

"In Virginia, it is the function and duty of the trial judge in the first instance before admitting a confession, to determine from the evidence, in the absence of a jury, whether the confession has been freely and voluntarily made. In this decision of a question of fact he has a wide discretion . . . .

"Thus the admissibility of a confession is a question for the court, and not for the jury. The court does not vouch for the confession, but admits it to the jury to be considered and weighed like other evidence. Its weight, its value and its sufficiency is a question for the jury."

The defendant concedes that the foregoing is a correct statement of the rule in Virginia, but urges us to change that rule, to adopt the

---

[1] "Instruction No. A. The Court instructs the jury that if they believe from the evidence that the confession of the defendant, *Thurmond* Robert McCoy, was secured by the State Police at Appomattox or the Sheriff of Campbell County, by making him believe that if he confessed he would receive a light sentence, then the confession was not voluntary, and you shall not consider the same."

practice of permitting the jury to pass upon the admissibility of confessions and, accordingly, to reverse his conviction because of the failure of the trial court to grant instruction A.

It is true that some jurisdictions follow rules with respect to confessions different from that observed in this Commonwealth. Many courts, however, adhere to the same rule as has been recognized here.

The subject was recently before the Supreme Court of the United States in *Jackson* v. *Denno*, 378 U. S. 368, 12 L. ed. 2d 908, 84 S. Ct. 1774. In an appendix to the separate opinion of Mr. Justice Black (12 L. ed. 2d, at p. 935 ff.), the various rules are summarized, as follows:

"I. *Wigmore or 'Orthodox' Rule.*

"Judge hears all the evidence and then rules on voluntariness for purpose of admissibility of confession; jury considers voluntariness as affecting weight or credibility of confession."

Twenty states, including Virginia, are listed as following the Wigmore or orthodox rule.

"II. *'New York' Rule.*

"If there is a factual conflict in the evidence as to voluntariness over which reasonable men could differ, the judge leaves the question of voluntariness to the jury."

Seventeen jurisdictions are listed as observing the New York rule.

"III. *'Massachusetts' or 'Humane' Rule.*

"Judge hears all the evidence and rules on voluntariness before allowing confession into evidence; if he finds the confession voluntary, jury is then instructed that it must also find that the confession was voluntary before it may consider it."

Fourteen jurisdictions are listed as recognizing the Massachusetts or humane rule.

*Jackson* v. *Denno*, *supra*, involved an attack upon the New York rule as applied by the New York courts. The majority opinion of the Supreme Court of the United States condemned the rule as unconstitutional because it did not "produce any definite, open and separate decision of the confession issue."

Of special interest to the issue before us is the court's ruling in the *Jackson* case that a defendant has a right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession."

The Wigmore or orthodox rule, as followed in Virginia, respects

and gives effect to the right of an accused to object to a confession and "to have a fair hearing and a reliable determination on the issue of voluntariness," as is called for in the *Jackson* case.

In fact, our rule was recognized by the Supreme Court, in the *Jackson* case, as being designed to do that which the New York rule failed to do, that is, to produce a "definite, open and separate decision of the confession issue." The Court said:

". . . In jurisdictions following the orthodox rule, under which the judge himself solely and finally determines the voluntariness of the confession . . . the judge's conclusions are clearly evident from the record since he either admits the confession into evidence if it is voluntary or rejects it if involuntary. Moreover, his findings upon disputed issues of fact are expressly stated or may be ascertainable from the record . . . ." 12 L. ed. 2d, at pp. 916, 917.

We hold our rule up against the declared weaknesses of the New York rule and the obvious confusion which would result from the application of the Massachusetts or humane rule, and find our practice not wanting. The Wigmore or orthodox rule is firmly embedded in our system of jurisprudence. It is founded upon sound reasons of fairness, order and reliability. Under such circumstances, a change in the rule is not justified.

The practice required by our rule and by the pronouncements of the Supreme Court of the United States in the *Jackson* case were followed by the trial court in the case now before us. It conducted a full hearing on the admissibility issue in the absence of the jury; it ruled that its action with regard to the confession was to be taken without "going into" the truth or falsity of the confession "at this time"; it made a "definite, open and separate decision" that the defendant's confession "was voluntarily given without duress or any promise." And finally, the court permitted the defendant to explore before the jury the full circumstances surrounding the giving of the confession, so that the jury could consider "voluntariness as affecting weight or credibility" of the confession, in accordance with the language of the Wigmore or orthodox rule.

We conclude that there was no error on the part of the trial court in refusing the defendant's instruction A.

The defendant's last contention is that the evidence was not sufficient to support his conviction. Here, the defendant relies upon the proposition that the testimony of Peggy Ann Tyree was inherently incredible.

In support of this contention, the defendant argues that the account given by Peggy Ann of the manner in which the defendant had sexual intercourse with her was "so contrary to human experience or usual human behavior as to render it unworthy of belief."

This contention of the defendant is so completely without merit as to make it unnecessary to describe the sordid details of the mechanics by which the defendant had carnal knowledge of Peggy Ann. Suffice to say that her story was not inherently incredible, but one for the jury to assess and weigh and to give such credit to as the jury might see fit.

Peggy Ann's version of the unfortunate incident under review was corroborated by Brenda Wood, by the surrounding circumstances and, finally, by the confession of the defendant. The evidence was sufficient to support the conviction.

We find no error in the record before us. The judgment of conviction will, therefore, be

*Affirmed.*