Richmond

GARY LYNN GRIGGS

v.

COMMONWEALTH OF VIRGINIA

June 8, 1979.

Record No. 781195.

Present: All the Justices.

*Fergus B. Norton (Norton & Raney,* on brief), for appellant.

*Vera S. Warthen, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

CARRICO, J., delivered the opinion of the Court.

Indicted for burglary and robbery, the defendant, Gary Lynn Griggs, was tried by a jury, found guilty as charged, and sentenced to the penitentiary. He seeks reversal, contending that the trial court erred (1) in failing to suppress his confession, (2) in refusing to strike the evidence, and (3) in granting an instruction on voluntary intoxication.

The record shows that after midnight on January 30, 1977, Betty Jean McKay closed her restaurant and, accompanied by two friends, departed for her home with business receipts totaling approximately $3,000. When Ms. McKay and her companions entered her home about 4:00 a.m., they were accosted by two

waiting burglars, one of whom was armed. All three victims were forced to lie on the floor; the hands and feet of all three were bound, and Ms. McKay's friends were gagged. Upon fleeing, the assailants took Ms. McKay's business receipts, several hundred dollars of other funds, and various items of personal property. The victims freed themselves from their bonds and called the police.

Investigation revealed that the burglars had entered the home by breaking "the basement door out." It was also ascertained that, while awaiting the arrival of their victims, the intruders "raided the refrigerator and ate the food."

None of the victims could furnish identification of the assailants. On March 4, 1977, however, the defendant was arrested on warrants charging him with burglary and robbery in the McKay incident. The next day, he confessed to his participation in the crimes.

In a pretrial hearing, the defendant sought unsuccessfully to have his confession suppressed on the ground that "his own peculiar suggestible nature" caused him to confess involuntarily. At this hearing, it was shown that, on the day of his arrest, the defendant was given his *Miranda** warnings and was questioned by Detective McKeever of the City of Roanoke Police Department. In a two-hour session, during which the detective recited some of the details of the crimes, the defendant made no response other than to answer inquiries eliciting "personal information."

Later the same day, the defendant's father sought out and talked to Detective McKeever concerning the defendant's predicament. McKeever told the father that the police had "evidence and witnesses who could place [the defendant] at the scene of the offense." The father then visited the defendant in jail and urged him to "tell the truth" because "they had the evidence on him."

The next day, after repeating the *Miranda* warnings, Detective McKeever again questioned the defendant. In a session lasting two and one-half hours, the defendant recited his father's admonition to him to "tell the truth" and then confessed in a detailed statement that supplied particulars of the crimes not previously known to the police.

During the suppression hearing, the defendant called as a

---

*Miranda* v. *Arizona*, 384 U.S. 436 (1966).

witness Dr. Robert Showalter, a psychiatrist and assistant director of the Forensic Psychiatry Clinic at the University of Virginia Hospital. Dr. Showalter examined the defendant in mid-September, 1977, some 7 1/2 months after the offenses occurred and approximately 6 months after the defendant gave his confession.

Dr. Showalter testified that the defendant told him "very little" concerning the crimes because the defendant "persisted in claiming amnesia." The doctor stated that he felt the amnesia was not "of a particular self-serving nature," but was the result of a "toxically based organic brain syndrome," caused by the defendant's prolonged and excessive use of drugs. The doctor testified further that the defendant also suffered from severe dyslexia, an "organically based reading deficit," which, from the defendant's early years, had prevented "meaningful relationships with peers" and had caused the defendant to become "a very compliant and very dependent young man." These difficulties, the doctor said, operated to cause the defendant, in a stressful situation such as police interrogation, to "return to a very childlike state," in which he was highly susceptible to suggestion.

Dr. Showalter admitted that the defendant's confession sounded "intelligible" and was "cognitively intact." The doctor opined, however, that the two-hour police interview on the day of the defendant's arrest, during which Detective McKeever "recycled" before the defendant information concerning the crimes, prompted the defendant's memory of the events and, in the coercively stressful and suggestive situation in which he found himself the next day, caused him to recite in the confession the specific details of the offenses.

As the Commonwealth concedes, the prosecution had the burden of showing that the defendant's confession was voluntary. *McCoy v. Commonwealth*, 206 Va. 470, 474, 144 S.E.2d 303, 307 (1965). Voluntariness is a factual question, and the prosecution's burden may be satisfied by proof by a preponderance of evidence. Voluntariness determines admissibility, and the question, therefore, is one for decision by the court and not the jury. *Witt v. Commonwealth*, 215 Va. 670, 674, 212 S.E.2d 293, 296-97 (1975).

Here, the Commonwealth's evidence clearly was sufficient to establish at least a prima facie case of voluntariness. Against this prima facie showing, the defendant did not offer the challenges usually made to the admissibility of confessions. No claim was asserted that the *Miranda* warnings were inadequate or

were not understood; indeed, the record shows that, at the beginning of each of his two periods of interrogation, the defendant was fully advised of his *Miranda* rights, and he signed a printed form waiving those rights. Neither was any allegation made of police misconduct in obtaining the confession; to the contrary, during the suppression hearing, defense counsel disavowed the "implication" that the police, "in any way, did anything wrong, in that they coerced a statement out of" the defendant. Nor was it contended that the defendant was intoxicated or that he was uneducated or unintelligent.

The argument advanced against the admissibility of the confession was that, in the stressful atmosphere of police interrogation, a defendant highly susceptible to suggestion unwillingly said what the police prompted him to say. To uphold this proposition, however, would require acceptance of the testimony of Dr. Showalter as conclusively sufficient to overcome the prima facie case of voluntariness made out by the Commonwealth's evidence. The trial court obviously refused to accept the doctor's testimony as so sufficient. On this record, we cannot disagree with the trial court.

In the final analysis, Dr. Showalter's testimony reduced itself, as he acknowledged, to the proposition that "there are rare, unusual situations [,] and this *may be* one of them, in which the mental state of the individual is so compromised, so as to raise serious question as to the ability of the individual to give a free and voluntary statement" (emphasis added). Thus, at best, Dr. Showalter's testimony raised only a *possibility* that the defendant's statement may not have been "free and voluntary." The mere existence of this possibility was insufficient to overcome the Commonwealth's case of voluntariness. We will not disturb, therefore, the trial court's factual finding that the statement was voluntary.

The defendant contends next that the trial court should have struck the evidence because of the Commonwealth's failure to show that he acted with criminal intent in the commission of the crimes. The Commonwealth offered no "concrete evidence" of intent, the defendant argues, and the only facts introduced at trial relating specifically to his conduct "negate any intent to rob or steal and show only an intent to comply with the demands of 'the man,'" meaning the defendant's alleged accomplice.

In this connection, the defendant points to two excerpts from his confession. The first relates to a point in time after the defendant

and his alleged accomplice had entered the McKay residence but before the victims had arrived. This excerpt reads: "Two cars drove [up] and I said 'let's get out of here, they're having a party' and the man said 'no, you're staying and go in the kitchen and wait.'" The other excerpt concerns incidents occurring after the victims' arrival. This excerpt reads: "I got the money bag and I was told to search them for wallets and so I searched them for wallets and I said 'there wasn't any' and he said 'look again.'"

The defendant relies also upon a statement he made to Detective McKeever, not contained in the confession, to the effect that he participated in the crimes because he "felt that harm would come to himself or his wife if he didn't go [along]." Additionally, the defendant cites the testimony of one of the victims that he overheard one of the robbers instruct the other to "tie them up." Finally, the defendant adverts to the psychiatric testimony concerning his susceptibility to suggestion.

We believe that it was for the jury to decide whether the defendant acted with criminal intent in the commission of the crimes. While the Commonwealth may not have produced "concrete evidence" of intent, such a failure is not unusual; of necessity, intent often is established by circumstantial evidence. There was abundant circumstantial evidence before the jury from which it could have inferred criminal intent. Furthermore, without apparent objection, the jury was instructed that "a man is presumed to intend that which he does, or which is the immediate or necessary consequences of his act."

The scraps of evidence relied upon by the defendant as conclusively negating criminal intent are insufficient for that purpose. For the most part, this evidence was not inconsistent with a finding that the defendant acted with criminal intent. To the extent that the evidence may have indicated a lack of the requisite intent, nothing more than a jury issue was created.

■ The defendant's final contention is that the trial court erred in granting Instruction No. 4, which told the jury that "voluntary drunkenness or drug intoxication is no excuse for crime." The defendant argues that this instruction not only was unsupported by evidence but also had the effect of misleading the jurors to believe that they could not consider evidence of the defendant's use of drugs in determining whether he possessed the requisite criminal intent at the time the offenses were committed.

These arguments obviously are inconsistent; they are also without merit. The record shows that, before he participated in the commission of the crimes, the defendant consumed both drugs and alcohol, so the instruction was supported by evidence. The instruction also correctly stated the law. Except in cases of first degree and capital murder, where proof of voluntary intoxication may negate deliberation and premeditation, *see Waye* v. *Commonwealth*, 219 Va. 683, 698, 251 S.E.2d 202, 211 (1979), such intoxication, whether from drugs or alcohol, is no defense to a criminal charge. *Chittum* v. *Commonwealth*, 211 Va. 12, 18, 174 S.E.2d 779, 782-83 (1970); *Johnson* v. *Commonwealth*, 135 Va. 524, 529, 115 S.E. 673, 675 (1923).

Finding no reversible error in the rulings below, we will affirm the judgment of the trial court.

*Affirmed.*