## Richmond

### CARROLL K. RODGERS, JR.

### v.

### COMMONWEALTH OF VIRGINIA

Record No. 830612.

June 15, 1984.

Present: All the Justices.

606

608

*Murray J. Janus; Robert J. Rice (Bremner, Baber and Janus,* on brief), for appellant.

*Todd E. LePage, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

Carroll K. Rodgers, Jr. was convicted, in a non-jury trial, of second-degree murder in the death, by stabbing and strangulation, of his fiancee, Gloria Kyle. His conviction was based almost entirely upon an inculpatory statement given by him to Chesterfield authorities after he had been advised of his *Miranda* rights and after he had signed a form in which he waived those rights.

Prior to trial, Rodgers filed a motion to suppress his statement on the ground that it was not voluntary. The trial court held a full evidentiary hearing and denied the motion. On appeal, Rodgers reasserts his contention that his statement was not voluntary. We disagree with Rodgers. Therefore, we will affirm the judgment of the trial court.

This matter comes to us on appeal following a trial court finding of voluntariness, thus, the scope of our review is limited to the question whether the evidence supports the finding. At trial, the Commonwealth has the burden to prove, by a preponderance of the evidence, that the defendant's statement was voluntary. *Stockton* v. *Commonwealth*, 227 Va. 124, 140, 314 S.E.2d 371, 381 (1984); *Griggs* v. *Commonwealth*, 220 Va. 46, 49, 255 S.E.2d 475, 477 (1979); *McCoy* v. *Commonwealth*, 206 Va. 470, 474, 144 S.E.2d 303, 307 (1965). However, once the trial court makes

a finding that the statement was voluntary, on appeal that finding is entitled to the same weight as a fact found by a jury and that finding will not be disturbed unless plainly wrong. *Stockton* v. *Commonwealth*, 227 Va. at 140, 314 S.E. 2d at 381. *See Townes* v. *Commonwealth*, 214 Va. 683, 204 S.E.2d 269 (1974).

The test for voluntariness derives from federal constitutional law relating to the Fifth Amendment as applied to the States through the Fourteenth Amendment. In *Stockton*, we relied upon *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973), and concluded that in order to determine whether a statement is voluntary, we must decide, in light of the totality of the circumstances, whether the statement is the product of an essentially free and unconstrained choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired. 227 Va. at 140, 314 S.E.2d at 381.

When the scope of review and the test for voluntariness are considered together, the question that confronts us on this appeal becomes apparent. We must here determine whether, in light of the totality of the circumstances, the trial court was plainly wrong in concluding that Rodgers' statement to the Chesterfield police was essentially a free and unconstrained choice on his part or, put another way, that his will was *not* overborne.

At the conclusion of the hearing on Rodgers' motion to suppress, the trial court made the following ruling:

It is true that this is an experienced interrogator and the accused has not had any experience of a criminal nature. But that alone is not enough to determine that he was coerced. There is no indication at the time of the interview this defendant was under the influence of alcohol or drugs. I think the statement is voluntarily made . . . .

At the end of the trial, the court again made reference to the question whether the statement was voluntary. This time the court made the following comments to Rodgers' counsel:

[A]s you pointed out, your client was the subject of skillful tactics, almost mesmerizing interrogation by an experienced investigator. I'm familiar with the *Spano* case [*Spano* v. *New York*, 360 U.S. 315 (1959).] as you represented it, that if in fact the interrogator in conversation controls the mind and overbears the will of the person he was questioning, that ad-

> mission will not be used. I listened closely during the suppression hearing. I had thought about the case since that time. I listened to direct testimony today. I reviewed in detail very carefully the tape and recall the matters which you urged me to consider and the context in which the statement was taken and the inducements that were offered. With all these matters considered, I felt that the confession or statement should not be suppressed, but I should consider it and weigh it as a trier of the fact.

If there is credible evidence to support the trial court's finding, we are bound to uphold it. *See Stockton* v. *Commonwealth*, 227 Va. at 140, 314 S.E.2d at 381-82.

The facts leading up to Rodgers' statement are as follows: At approximately 11:00 p.m. on Friday, May 7, 1982, Gloria, driving Rodgers' car, picked him up from work. She had used the car earlier in the day to move certain of her belongings to his apartment in anticipation of their marriage. They stopped to buy a six-pack of beer on their way to a local nightspot. Rodgers drank five of the beers in the short time it took them to drive to the nightclub. Earlier, at work, he had taken a "hit" of LSD. At the nightclub, Rodgers drank four more beers.

While at the nightclub, one of Rodgers' former girlfriends came up to speak to him. He greeted her with an embrace. When she sat down at Rodgers' table he put his arm around her and a strap on her dress fell from her shoulder. Gloria became angry and accused Rodgers of trying to pull the other woman's clothes off. Gloria ran from the table into the restroom. Shortly thereafter, she ran from the restroom, past Rodgers, and out the door. Rodgers got up to chase her. He bumped into several people and the club's "bouncer" told him to leave.

When Rodgers got outside he said he was detained momentarily by two other people. According to Rodgers, by the time he got to the car, Gloria was nowhere in sight but her pocketbook and his keys were inside the car. He said he drove around the block several times looking for her but could not find her. He explained that he did not go back into the club to search for her because the bouncer had thrown him out. He said he finally gave up looking for Gloria and drove to his apartment where he went to sleep.

Rodgers claimed that he last saw Gloria running out of the club at approximately 1:00 a.m. on Saturday, May 8, 1982. Later that

day, after he had gone home and slept, he explained to his parents that Gloria had run away and asked whether they had seen her. On Saturday and Sunday Rodgers said he, his parents, and his sister made several efforts to locate Gloria but she could not be found.

On Monday, May 10, 1982, Mrs. Rodgers, defendant's mother, read, in the newspaper, a description of an unidentified body that sounded like Gloria. Mrs. Rodgers notified her husband who in turn called the police. A Chesterfield police investigator came to the Rodgers' home to talk with defendant and his father. In the course of the discussion, defendant and his father said they wanted to do everything possible to cooperate with the police.

At the request of the police, Rodgers and his father went to police headquarters for questioning. They were shown a picture of Gloria in the battered form in which her body had been found. Rodgers recognized her and broke down and cried. Both Rodgers and his father were advised of their *Miranda* rights and both signed a "Waiver of Right to Remain Silent And of Right to Advice of Counsel." Rodgers signed his waiver at 5:45 p.m. on May 10, 1982. After questioning, during which Rodgers told the police that the last time he saw Gloria was when she ran out of the club, Rodgers and his father were released.

As part of the questioning on May 10, 1982, the police asked for Rodgers' permission to search his apartment and his car. He agreed and signed a "Form for Consent to Search." The search of the car, which was conducted in the presence of Rodgers and his father, revealed minute stains of what appeared to be blood which were collected for laboratory analysis. The search of Rodgers' apartment revealed Gloria's pocketbook, which was found in a drawer.

On May 12, 1982, a Wednesday, the police called the home of Rodgers' parents to ask whether Rodgers would agree to come to police headquarters for further questioning. Rodgers agreed. Again, he was accompanied by his father. Again, he was advised of his *Miranda* rights. Again, he signed a waiver. The second waiver was signed at 1:46 p.m. on May 12, 1982. After the waiver was signed, the police asked Rodgers whether he would submit to a polygraph examination. He said yes.

Rodgers' father was allowed to accompany his son to State Police headquarters where the polygraph test was to be administered but was told that he could not be with his son during the examina-

tion. Before administering the test, the State Trooper who was to do the testing secured from Rodgers a signed "Agreement to Submit to Polygraph Examination." In that agreement, Rodgers stated that he was submitting to the test voluntarily. In addition, the State Trooper advised Rodgers of his *Miranda* rights. For the third time Rodgers signed a waiver of those rights. This third waiver was signed at 2:55 p.m., shortly before the polygraph test was administered.

Before beginning the test, the State Trooper checked Rodgers to see if he was suitable for testing. He asked Rodgers whether he was under the influence of alcohol or drugs at that time. Based on Rodgers' negative reply and the Trooper's observations, he concluded that Rodgers was suitable for testing. At the conclusion of the test, which indicated that Rodgers was lying, both Rodgers and the Chesterfield investigator who accompanied him were advised of the results.

Because of the polygraph results, the Chesterfield investigator sought to interrogate Rodgers further. The interrogation lasted no more than 90 minutes. It was conducted at the State Police facility during daytime working hours. Only one officer did the questioning. In that interrogation, Rodgers was neither beaten nor threatened; he was neither harassed nor yelled at; he was neither held incommunicado nor refused counsel; he was neither deprived of any physical needs nor questioned to the point of fatigue. Nevertheless, he now says his will was overborne.

Rodgers argues that the circumstances, which caused his statement to be involuntary, included the following: At the time of the interrogation he was only twenty years old, had only finished high school, was of low intelligence, and had no experience with police interrogation.

He says further that he was religious and susceptible to religious entreaties and that the police were aware of this because they knew he and Gloria had met in a church group. He says that the interrogating officer made improper religious appeals urging him to "cast the devil out of his life" and "get right with God."

He says that on May 10, 1982, the police unnecessarily showed him a picture of Gloria's battered body and thereby caused him nightmares because he loved her and the police knew he loved her because the police were aware of the couple's planned marriage. He says further that on the day of the interrogation he had planned to visit the funeral home and to place mementos in Glo-

ria's coffin but was prevented from doing so because of the interrogation.

He contends, too, that he was lied to by the interrogator, that he was promised leniency, that he was obviously distraught during the interview because he cried and sobbed at several points, that he did not have an attorney present, and that he simply parroted what the interrogator told him as evidenced by the many times he said "I don't know," and "I don't remember."

Rodgers admitted during oral argument that no single factor cited by him is sufficient in and of itself to warrant the conclusion that his will was overborne and his statement involuntary. However, he says that when all the factors are taken together, it is clear that his will was overborne. We could not disagree more. We think the totality of the circumstances confirms the correctness of the trial court's ruling.

■ In our opinion, the record reveals a completely different picture than the one painted by Rodgers. This was no helpless, feeble-minded youth. This was a young man, twenty years old, who lived in his own apartment, drove his own car, held down a steady job, and was planning to get married. He was a mature, independent individual in control of his life. Even though this may have been his first encounter with the police, there is no evidence that he was in any way disadvantaged or intimidated by this fact.

■ Rodgers' claim that he was particularly susceptible to religious entreaties is not supported by the evidence. He stopped attending church on a regular basis when he turned 16 and his parents gave him the choice of attending or not attending. The only evidence that relates to religious vulnerability is Rodgers' suggestion—in answer to a question from his counsel—that he was "a religious man within" himself. Further, the religious appeals which were made to him were nothing more than one part of the totality of the circumstances and, as is discussed below, such appeals do not usually void an otherwise voluntary statement.

■ With regard to the police's showing Rodgers a picture of the decedent, there is no evidence that this was done to harass him or weaken his will. The simple explanation is that, whether Gloria had previously been identified or not, the police needed to show Rodgers the picture to be sure that all concerned were talking about the same individual. Moreover, with regard to Rodgers' claim that the interrogation prevented him from going to the fu-

neral home to pay his last respects to Gloria, the record nowhere reveals that he made his desire known to the interrogator.

█ Though Rodgers claims he was lied to, the record reveals a conflict in the evidence on that point, and, in light of the trial court's ruling, that conflict must be said to have been resolved in favor of the Commonwealth. But even if we assume that the interrogator lied, the cases discussed below establish that even a complete falsehood is but another circumstance to be considered.

█ On this record we find no promise of leniency. But even if we assume that one was made, again, according to the cases it is merely a circumstance to be considered.

█ The fact that Rodgers did not have an attorney present has a two-fold response. First, he waived his right to counsel in a signed waiver form. Second, at no time during the interrogation did he ask to consult an attorney.

█ A review of the tape recording of the interview does not support Rodgers' contention that he was distraught throughout his interrogation. Certainly, he cried at points. But during long intervals, he displayed remarkable calm in talking with the interrogator and describing various events. The intermittent tears of a person implicating himself in a violent crime against a loved one should not be unexpected and, in this case, do not support the argument that defendant's will was overborne.

Rodgers said "I don't know" and "I don't remember" several times, but even as he protested he revealed bit by bit his involvement in this crime. He told the interrogator things that the interrogator could not know and did not suggest. When a person says "I don't know," his statement does not necessarily indicate a lack of knowledge; it sometimes indicates, as it does here, a reluctance to put the truth squarely on the table.

Rodgers concedes that the voluntariness of his statement must be viewed in light of the totality of the circumstances; nevertheless, he places special emphasis upon three factors: the religious comments, the alleged promise of leniency, and the alleged falsehood on the part of the interrogator. Because of Rodgers' emphasis upon these items, we will consider them in more detail than the others.

█ Rodgers suggests that it was impermissible for his interrogator to tell him to "cast aside the devil" and to get "straight with God" by telling the truth. In oral argument, though he was careful to concede that the religious remarks, by themselves, were not

enough to require reversal, he submitted that they came "pretty close." In short, Rodgers intimates that religious remarks should be treated in a manner different from other circumstances surrounding a confession.

The only case cited by Rodgers on this point was *Davis* v. *North Carolina*, 339 F.2d 770 (4th Cir. 1964). However, *Davis* was reversed on appeal. 384 U.S. 737 (1966). There, the Supreme Court held that a confession obtained after 16 days of detention in a holding cell was involuntary. In *Davis*, one of the many circumstances was that a prayer was said in defendant's presence just prior to his confession. Though the prayer was mentioned by the Supreme Court, the confession was not found involuntary on that basis. The prayer was simply set forth in describing the totality of the circumstances surrounding the confession. *Davis* does not elevate a religious comment, made by the interrogator, to some special status that compels a finding of involuntariness where a confession follows the religious remark. Therefore, we reject Rodgers' suggestion that a religious remark is anything more than another circumstance to be considered.

In *Shifflet* v. *Commonwealth*, 55 Va. (14 Gratt.) 652 (1858), the interrogator asked a prisoner, "What do you mean by what you say? In the name of God and all that is holy, have you let this charge rest on your mother, and she innocent of it?" *Id.* at 662-63. This Court found the ensuing confession voluntary. In so doing, we did not find it necessary to make specific mention of the religious remark. We merely concluded that the words used by the interrogator "do not naturally import any promise or threat, and were not so construed by the judge who saw and heard the witnesses." *Id.* at 664.

In three recent cases from other jurisdictions, religious remarks were viewed as only one part of the totality of the circumstances and were held not to be coercive. *See State* v. *Haridmon*, 310 N.W.2d 564 (Minn. 1981) (religious remarks "were not improper or coercive"); *Barrera* v. *State*, 99 Wis. 2d 269, 298 N.W.2d 820 (1980) (statement that defendant would have to face up to it when he met his maker was not "so overbearing as to render his confession involuntary"), *cert. denied*, 451 U.S. 972 (1981); *People* v. *Bowen*, 87 Ill. App. 3d 221, 408 N.E.2d 993 (1980) (entreaty to defendant "to make peace with yourself, your God, and your children" said not to amount to psychological coercion).

■ Even a lie on the part of an interrogating police officer does not, in and of itself, require a finding that a resulting confession was involuntary. In *Frazier* v. *Cupp*, 394 U.S. 731 (1969), the Supreme Court made clear that even an outright falsehood by a police interrogator is but another factor to be considered in evaluating the totality of the circumstances. In *Frazier* the officer told the defendant that one of the defendant's friends had confessed. This was false. The defendant, after some further hesitation, confessed. He argued that the falsehood rendered his confession involuntary. Justice Marshall, writing for the Court, rejected that argument:

> The fact that the police misrepresented the statements that Rawls had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible. These cases must be decided by viewing the "totality of the circumstances," see, *e.g., Clewis* v. *Texas*, 386 U.S. 707, 708 (1967), and on the facts of this case we can find no error in the admission of petitioner's confession.

394 U.S. at 739. *See also Sovalik* v. *State*, 612 P.2d 1003 (Alaska 1980); *State* v. *Winters*, 27 Ariz. App. 508, 556 P.2d 809 (1976). In light of *Frazier*, even if the interrogator in this case had lied, which is disputed, all the circumstances would still have to be examined to determine voluntariness. Here, even if we assume a falsehood, we do not think Rodgers' statement was rendered involuntary.

■ In oral argument, Rodgers submitted that the following statement was a promise of leniency: "We're gonna [sic] submit this to the Commonwealth Attorney and then he makes the decision." We do not perceive this statement to be a promise of leniency. But even if it were a promise, such promises have generally been found insufficient to overbear a defendant's free will. *See, e.g., United States* v. *Robinson*, 698 F.2d 448 (D.C. Cir. 1983); *United States* v. *Ballard*, 586 F.2d 1060 (5th Cir. 1978); *United States* v. *Curtis*, 562 F.2d 1153 (9th Cir. 1977), *cert. denied*, 439 U.S. 910 (1978).

■ We hold that the totality of the circumstances supports the trial court's ruling that Rodgers gave his statement voluntarily and that it was properly admitted into evidence. He had been advised repeatedly of his rights and had waived those rights. He en-

gaged in a cautious give-and-take with the interrogator. He answered those questions he wanted to answer and skirted those he did not want to answer. He never broke down and became "putty in the hands" of the interrogator or a "parrot" for words put into his mouth. Rodgers knew what he was doing and what he was saying. Finding no evidence that he was compelled to be a witness against himself, we will affirm the judgment.

*Affirmed.*