## CIRCUIT COURT OF CAMPBELL COUNTY

Commonwealth of Virginia

    v.

Lyle R. Mitchell

June 14, 1991

By JUDGE JAY T. SWETT

The defendant, Lyle R. Mitchell, is charged with the murder of Richard W. Elliott. The defendant has moved to suppress several incriminating statements made before and after his arrest. The issues raised by the defendant in his motion to suppress are as follows. First, did the amount of alcohol consumed by the defendant make him incapable of making a knowing, intelligent and voluntary waiver of his right to remain silent? Second, once the defendant was given *Miranda* warnings, should incriminating statements made subsequent to those warnings be suppressed because of a statement made by the investigating state trooper prior to the defendant being transported to the sheriff's office? Third, after the defendant indicated his desire to remain silent and to invoke his right to counsel, should subsequent incriminating statements made by the defendant be suppressed because the defendant agreed to give a blood alcohol test while at the sheriff's office? Fourth, once the defendant elected his right to counsel, should subsequent incriminating statements made by the defendant be suppressed because of the renewal of question-

ing by one of the officers investigating the homicide? Fifth, was there a prejudicial delay in taking the defendant to the magistrate such that any statements made prior to his being taken to the magistrate should be suppressed? For the reasons stated herein, the court grants the defendant's motion as to the fourth issue and denies the defendant's motion as to the others.

An evidentiary hearing on the defendant's suppression motion disclose the following facts. Shortly after 6:30 p.m. on January 1, 1991, Virginia State Trooper Robert Hubbard heard a radio transmission that Richard Elliott had been shot and that a blue and white pickup truck believed to be owned by the defendant had been seen at Elliott's house. Hubbard knew Elliott and Mitchell. The dispatcher requested assistance in locating Mitchell. Hubbard knew the defendant and drove directly to Mitchell's home. He saw Mitchell's truck, approached the house and announced himself by name. The defendant looked out and spoke to the trooper by name. Hubbard asked Mitchell if they could talk. The defendant invited him in. Hubbard asked Mitchell whether he had been to Richard Elliott's. Before asking this question, Hubbard did not advise the defendant of his *Miranda* rights. The defendant responded and began to make incriminating statements that involved him in the shooting. Hubbard told him to stop talking and read the defendant his *Miranda* rights. The defendant then made additional incriminating statements.

At about that time, Campbell County Investigator Jordan arrived at the defendant's home. After conversing with Hubbard, Jordan placed the defendant under arrest at around 7:00 p.m. Jordan then transported the defendant to the Campbell County jail. During the ride, the defendant made additional incriminating statements.

Upon his arrival at the sheriff's office, the defendant was taken into an interrogation room. Investigator Jordan advised the defendant of his right to remain silent and his right to counsel. In conjunction with advising the defendant of his rights, Jordan brought a tape recorder into the interrogation room and placed it on the table. After being advised of his rights, the defendant put his finger to his lips indicating that he did not want to say anything, stated he wanted a lawyer, and that he wanted someone to call his brother. Jordan then called for Deputy

Sheriff Robey. He told Robey to stay with the defendant and not to ask any questions except to ask the defendant whether he would agree to take a breath test to determine his blood alcohol count. Jordan then left the room.

Deputy Robey came in and asked the defendant if he would agree to submit to a breath test. The defendant consented. The test measured .17% blood alcohol content. After that the defendant began to make incriminating statements. Robey left the room to tell Jordan what the defendant was saying. Jordan gave Robey the tape recorder and told him to place the recorder on the table, turn it on, but ask the defendant no questions. Robey followed these instructions. The defendant continued to make incriminating statements.

After several minutes, State Trooper Hubbard came to the sheriff's office. Upon entering the interrogation room, he said to the defendant, "Damn it, Mitchell, what have you done tonight?" After a brief exchange, defendant made additional incriminating statements. Mitchell was then taken to the magistrate's office by Investigator Jordan where warrants were issued and served. The defendant was charged with murder and felonious use of a firearm.

The principal thrust of defendant's motion to suppress is that he was so intoxicated on the evening of January 1, 1991, that he was incapable of making a knowing, voluntary, and intelligent waiver of his right to remain silent. It is well settled that a defendant who is intoxicated may make a voluntary waiver of his right to remain silent. The fact that alcohol has been consumed by the defendant becomes another factor in the overall consideration of whether defendant's waiver of his right to remain silent was the "product of a rational intellect and a free will." *Yarborough v. Commonwealth*, 217 Va. 971, 974 (1977). One does not lose the capacity to make a knowing and intelligent waiver solely because of one's state of intoxication. *Id.* The test to determine whether a waiver is voluntary remains whether the statements were "the product of an essentially free and unconstrained choice by its maker" or whether the maker's will "has been overborne and his capacity for self-determination [was] critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

Voluntariness depends on the "totality of all of the surrounding circumstances." 412 U.S. at 226. The burden

to prove that a defendant made a knowing and intelligent waiver of his *Miranda* rights is upon the Commonwealth. *Griggs v. Commonwealth*, 220 Va. 46, 49 (1979).

Here, the evidence was that the defendant started drinking at about 12:00 noon. He drank six to eight beers, two drinks of whiskey around 4:00 p.m. and a beer and a drink around 6:00 p.m. The defendant said that mixing beer and whiskey created memory problems. However, he testified that as of 6:00 p.m., he did not think he had had too much to drink.

He also testified that his memory of his conversation with Trooper Hubbard at his home on January 1, 1991, was not very good. He did recall sitting down with Hubbard and talking about Richard Elliott. Although he did not recall Trooper Hubbard reading him his *Miranda* rights, he acknowledged those rights may have been read to him.

The defendant recalls being placed under arrest by Jordan at his home and being transported to the sheriff's office by Jordan. He recalled conversing with Jordan about the best route to take. They discussed alternative routes by number, that one route was longer and that one went by his brother's home.

The defendant did not recall how he got into the jail, nor did he recall signing a document invoking his right to remain silent and right to counsel. He did recall talking with Detective Robey, recalled the tape recorder and recalled his conversation with Trooper Hubbard. The defendant denied that he was an alcoholic but indicated that sometimes he drank too much.

Most of the officers who saw the defendant during the evening testified that it was obvious that the defendant had been drinking. Trooper Hubbard, who had known the defendant for ten years, testified that he had seen the defendant in various states of intoxication, that he had seen him on prior occasions more intoxicated than he was on January 1, 1991, that he had no problem communicating with him that evening, and that the defendant made sense when he talked to Hubbard. Jordan, who also had known Mitchell for several years, testified that Mitchell seemed to understand what was going on, that he seemed coherent and, with regard to his level of intoxication, had seen Mitchell in "worse shape." At the police station, Jordan was sufficiently concerned about Mitchell that he helped

him into the police station because he was concerned that Mitchell might fall and hurt himself. Robey, who was with the defendant in the interrogation room, indicated that the defendant had red and glassy eyes, and that although hie speech was clear, he would constantly change the subject matter. Robey stated that he thought the things said by Mitchell were coherent and that what he said made sense. He described the defendant as being calm but somewhat angry.

Mr. Richard McGarrett, a toxicologist with the Roanoke Bureau of Forensic Science, qualified as an expert in toxicology. He stated that as a general rule, heavy drinkers acquire the ability to give the appearance of being less clumsy, better talkers, and generally develop a tolerance to alcohol as to certain behavior. He further stated that one who has a blood alcohol level of .17 is generally capable of understanding as well as being understood. He further testified that even though one is an experienced drinker, alcohol will still affect one's judgment and decision-making capability. He also testified that based on the rate in which alcohol is eliminated from the blood stream, it is possible that Mitchell's blood alcohol level might have been .02 or .025 higher an hour or so before the test was administered.

Taking all of these circumstances together, this court is persuaded that the defendant, although he had consumed a considerable amount of alcohol, retained the ability to make a knowing, intelligent and voluntary waiver of his *Miranda* rights. The testimony indicated that the defendant operated a vehicle without difficulty shortly before Hubbard came to his home. He recognized Hubbard, invited him in, and began speaking with him. Apart from the issue of alcohol, the court would have little difficulty finding that Mitchell's decision to speak to Hubbard and the others was an unconstrained and uncoerced decision. One important factor on which this court places great weight is the fact that the defendant did make a decision at the sheriff's office to invoke his right to remain silent and to request an attorney. This was done at roughly 7:30 p.m. If he was able to make this choice at 7:30 p.m., it is difficult to see why he was not able to make the same choice 30 or 45 minutes earlier. Viewing the circumstances as a whole, I find that the defendant was capable

of and that he did make a knowing, voluntary and intelligent waiver of his right to remain silent when questioned by Trooper Hubbard at his home.

The court further finds that any statements made by Mitchell to Hubbard or anyone else at Mitchell's home before he was advised of his *Miranda* rights were statements not made during a custodial interrogation. When Trooper Hubbard arrived at Mitchell's residence, he did not have sufficient information to constitute probable cause to make an arrest. The initial questioning was done in a noncoercive manner in the defendant's home. Initially, Trooper Hubbard was the only officer present. He had been invited into Mitchell's home by Mitchell. Viewing the circumstances as a whole, any statements made by Mitchell prior to Hubbard reading him his *Miranda* warnings were not made during a custodial interrogation.

With regard to any incriminating statements made by Mitchell in the presence of Jordan while driving to the sheriff's office, the court does not agree that those should be suppressed. While Trooper Hubbard did tell Mitchell as he was leaving his home that he would have to go to Rustburg with Jordan and would need to speak with him about the incident, this was not done in a coercive or inappropriate way to taint any subsequent statements. The defendant had just been read his *Miranda* rights, and he chose to waive those rights and speak to Hubbard. Jordan asked no questions of Mitchell while en route to the sheriff's office. The issue would be different if Jordan had conducted an intensive interrogation en route to Rustburg after the defendant chose to remain silent, but the evidence is to the contrary.

Once Mitchell arrived at the sheriff's office, Jordan read him his *Miranda* rights. Mitchell responded by indicating he did not wish to speak and wanted an attorney. All questioning then ceased. Robey, at Jordan's request, did ask Mitchell if he would submit to a breath test to determine his blood alcohol level. Mitchell consented. A request by a police officer that one take a blood alcohol test does not constitute a *Miranda* interrogation. *South Dakota v. Neville*, 459 U.S. 553, 564 (1982); *Wright v. Commonwealth*, 2 Va. App. 743, 746 (1986). *See also, Schmerber v. California*, 384 U.S. 757 (1966). If such a question does not constitute a custodial interrogation, the court

does not see why any contemporaneous unsolicited voluntary statements made by the defendant should be suppressed under *Edwards v. Arizona*, 451 U.S. 477 (1981). *Edwards* requires that once a defendant has exercised his right to counsel, the police may not initiate further interrogation. This was not done here, at least up until Trooper Hubbard entered the interrogation room. Since, under *Edwards*, a defendant may make voluntary statements after he has exercised his right to counsel, the court does not see why voluntary incriminating statements should be suppressed simply because he consented to the breath test.

The situation is different when one looks at the exchange between Trooper Hubbard and the defendant at the sheriff's office. It is true that the defendant had specifically requested Trooper Hubbard to come to the station. Mitchell stated that he was concerned about his car. When Trooper Hubbard walked into the interrogation room, the defendant had previously exercised his right to remain silent and had requested an attorney. Although he previously made voluntary incriminating statements to Robey, this was not a license to institute further interrogation once Mitchell had requested an attorney. The question by Trooper Hubbard, "What have you done tonight?", is a question that would likely produce an incriminating answer. Since this question was initiated after Mitchell had requested counsel, any incriminating statements made in response are inadmissible at trial.

Finally, the court denies the defendant's motion to suppress any statements because of any delay in taking the defendant to the magistrate's office. As indicated in *Frye v. Commonwealth*, 231 Va. 370, 376 (1986), Virginia's statutory requirement that an arresting officer take an accused before a judicial officer without unnecessary delay is a matter of procedure. Violation of this statute reaches constitutional dimensions "only if it results in the defendant's loss of exculpatory evidence." *Id.* Assuming some delay in taking the defendant to the magistrate's office, the court does not find any loss of exculpatory evidence. The only evidence which the defendant contends may have been lost was that an earlier breath test may have resulted in a higher blood alcohol content to add weight to his argument that he was so intoxicated

as to be incapable of making a voluntary waiver of his *Miranda* rights. However, the police were not required to give the defendant a breath test. It is difficult to see how this can be a basis to argue the loss of exculpatory evidence.

In conclusion, the court denies the defendant's motion to suppress, except to the extent that incriminating statements made in response to Trooper Hubbard's question at the sheriff's office are inadmissible.