COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Senior Judge Hodges
Argued at Alexandria, Virginia


KEVIN MARK SABO
                                              OPINION BY
v.    Record No. 0538-00-4            JUDGE WILLIAM H. HODGES
                                              APRIL 9, 2002
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                      Joanne F. Alper, Judge

            William R. Martin; Patrick O. Cavanaugh
            (Christopher B. Stone; Shawn M. Wright; Dyer
            Ellis & Joseph, on brief), for appellant.

            Eugene Murphy, Assistant Attorney General
            (Mark L. Earley, Attorney General, on brief),
            for appellee.


     The appellant, Kevin Sabo, appeals his conviction for

attempted malicious wounding, in violation of Code §§ 18.2-26

and 18.2-51.  Sabo contends the trial court erred in: (1)

refusing to suppress tape-recorded statements he made to Heather

Lawrence; (2) admitting those audiotaped statements at trial;

and (3) refusing to allow Dr. Julian Brantley to testify.  For

the following reasons, we affirm.

                           BACKGROUND

     Appellant and Heather Lawrence began a romantic

relationship in the summer of 1998.  The relationship became

increasingly strained and in early March 1999, Lawrence ended

it.  Following the break-up, Lawrence began receiving anonymous

phone calls.  On March 16, 1999, Lawrence agreed to have lunch with appellant at a local restaurant.  The two had earlier discussed the "strange phone calls," and appellant showed concern, making Lawrence receptive toward maintaining a friendship with appellant.  After lunch, Lawrence and appellant parted and returned to their respective offices.  They did not see each other the remainder of that day or night.

Lawrence went out after work on March 16 unaccompanied by appellant and returned home during the early morning hours of March 17.  She parked on a side lot near her townhouse.  Around 9:00 a.m. on March 17, 1999, Lawrence left her townhouse, entered her car and proceeded to drive to work.  She approached a stop sign at an intersection and tried to stop her car; however, her brakes did not work.  Lawrence "turned the car hard left, . . . hit a fence, a low brick wall and a tree."  Lawrence recalled seeing fluid on the ground just before she entered her car.

Prior to trial, appellant moved to suppress the introduction of incriminating statements he made to Lawrence in a telephone conversation that Lawrence recorded and provided to police.

### 1.  MOTION TO SUPPRESS STATEMENTS

#### <u>Facts</u>

On appeal from a trial court's denial of a motion to suppress, we must review the evidence in the light most

favorable to the Commonwealth, granting to the Commonwealth all reasonable inferences fairly deducible from it. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). The findings of the trial court will not be disturbed unless plainly wrong or without evidence to support them. See Mier v. Commonwealth, 12 Va. App. 827, 828, 407 S.E.2d 342, 343 (1991).

When reviewing the trial court's denial of a defendant's motion to suppress evidence, "the burden is upon [the defendant] to show that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error." McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (citations omitted).

Detective Coale investigated the March 17 incident involving Lawrence's car. He first met with Lawrence on March 19, 1999. In addition to her brake lines being cut, Lawrence advised him she had received "a number of [anonymous] phone calls to her residence in the middle of the night and at different times where people hung up and had not left a message." Coale learned from Lawrence that her relationship with appellant "had gone sour over the last several months" and that "[t]here had been an incident involving a slashing of one of her tires that coincided with a spat that her [sic] and Mr. Sabo had had." As a result, Coale "provided her with a tape recorder to tape anything that might - - any phone calls that she might receive." He gave Lawrence the recording device about

a week after first meeting with her.  Coale testified that he

"told [Lawrence] not to contact the defendant.  That if he

called and she wanted to make the tapes, that would be useful to

our investigation."

Lawrence testified she was extremely fearful after the

March 17 car accident.  She had no idea who placed the anonymous

calls and sabotaged her brakes.  She worried constantly about

future acts against her, and she was afraid of being alone in

her residence.  As a result, she installed a security system,

kept mace and a whistle on her person at all times, kept a

baseball bat in her house and avoided being alone.  Coale

installed the tape recorder around March 24, 1999, and provided

her with approximately six blank audiotapes, which she used to

record several conversations with appellant.  Lawrence testified

that after Coale installed the recorder, he suggested that

Lawrence call appellant to tape his reaction to her accident

because Lawrence had not spoken with appellant after the

accident.[1]  Lawrence shared the earliest recorded conversations

with Coale, but he advised her not to contact appellant anymore

---

[1] Although Lawrence's recollection on cross-examination
differed from Coale's earlier testimony that he "told" Lawrence
not to contact appellant, appellant did not call Coale as a
witness and inquire into this apparent conflict.  Moreover, the
fact finder was not bound by either party's testimony and could
believe that which is more favorable to the Commonwealth.  See
Eaton v. Commonwealth, 240 Va. 236, 249-50, 397 S.E.2d 385, 393
(1990).

because "[t]he conversations weren't really going anywhere."
Despite that admonition, Lawrence contacted appellant periodically and taped more conversations.  The evidence further showed that appellant continued to telephone Lawrence and speak with her, and Lawrence also taped portions of those conversations.

Appellant telephoned Lawrence around 9:00 p.m. on April 20, 1999.  That conversation ended around 1:00 a.m. on April 21, 1999, and was the conversation in which appellant first made incriminating statements, the substance of which he sought to suppress.  Lawrence taped excerpts of that lengthy conversation.  Lawrence explained that she only had two audiotapes left to use, so she paused the machine and did not record portions dealing with innocent or personal information unrelated to Lawrence's fears for her safety.  Lawrence also admitted recording over previously recorded portions when she needed additional tape.  During the April 20-21 conversation, appellant admitted making anonymous phone calls to Lawrence and doing something to her car.

On the morning of April 21, 1999, Lawrence telephoned appellant at his office, hoping he would elaborate on his earlier admissions.  Lawrence also taped that conversation.  Appellant provided details about the incident involving her car.  He explained that he went to a bar, became intoxicated, grabbed tools from his house, drove to her residence and did something

to her car.  Lawrence delivered the incriminating tapes to Coale at police headquarters on two successive days.  Coale listened to one tape on April 21 and the other tape on April 22, 1999.  He testified that "[a]fter she made this first tape, we told her just to leave it alone and go back home, and we will see how the case develops."  He also told her "that she didn't have to make any more tapes unless [appellant] called her . . . [yet] she went ahead and apparently made [the second tape] anyway, and she brought it in" on April 22, 1999.  After hearing appellant's audiotaped admissions that he did something to her car, Coale obtained a search warrant.

The trial court admitted into evidence the audio cassette tapes of the two telephone conversations.  In doing so, it focused its analysis on whether Lawrence "when she was speaking to the defendant and the defendant ultimately made admissions to her, whether or not she was an agent of the state . . . in connection with this action."  Although the police provided and installed the equipment a month before the incriminating tapes were recorded, the police instructed Lawrence "not to call the defendant."  After Lawrence provided the April 20 tape, Coale again instructed Lawrence not to call appellant.  By ignoring those admonitions, the trial court found that Lawrence "acted on her own" in contacting appellant at various times.  According to the trial court, Lawrence "did not follow the instructions of the Arlington police" when she initiated calls.  After listening

to the testimony and evidence, including the taped conversations, the trial court determined that Lawrence had a "separate and independent reason to find" out who was doing these things to her "wholly apart from whether or not there was to be any prosecution." She wanted to allay her fears and discover who was victimizing her. To that end, she wanted to either identify or eliminate appellant as a suspect.

Applying by analogy case law involving Fourth Amendment searches by private individuals, the trial court ruled that Lawrence's purpose was not to assist law enforcement to prosecute appellant but to further Lawrence's "own ends and goals," namely, a desire to identify and stop the person who was placing her in constant fear. The trial court further found that the Commonwealth had minimal and infrequent involvement in obtaining the taped statements.

Furthermore, the trial court ruled that, even if Lawrence were an agent, appellant's incriminating statements were voluntary and "were not the result of any coercion."

## Analysis

Appellant puts forth two arguments regarding his incriminating statements. He contends (1) that Lawrence "was acting as an agent for the Commonwealth," and (2) his statements to her were involuntary "because they were the result of

coercion, [and] threats and, thus, were observed in violation of his fifth and fourteenth amendment rights."[2]

### a.  Government Agent

We have not previously addressed the proper method for determining whether an individual is acting as an agent of the state in the context of the Fifth Amendment.  However, we agree with the trial court's application of concepts and procedures employed in prior case law involving searches and seizures by persons alleged to be government agents.  Therefore, we hold that the analyses employed to determine whether an individual acted as a state agent for Fourth Amendment purposes applies equally to situations involving alleged Fifth Amendment violations.

Accordingly, appellant bore the initial burden to establish that Lawrence acted as a government agent in obtaining his incriminating statements.  See Debroux v. Commonwwealth, 32 Va. App. 364, 371, 528 S.E.2d 151, 154 (2000) (alleging search by state actors); see also Mills v. Commonwealth, 14 Va. App. 459, 464, 418 S.E.2d 718, 720 (1992) (when defendant alleges search was conducted by state actor, it is defendant's burden to

---

[2] We note initially that appellant does not and cannot argue a Miranda violation because the warnings mandated by Miranda v. Arizona, 384 U.S. 436, 467-73 (1966), intended to safeguard a defendant's Fifth Amendment rights, are required only when there is custodial interrogation.  Because appellant was not in custody when he made the incriminating statements, Miranda warnings were not required.

establish by preponderance of the evidence that private party acted as government instrument or agent); Duarte v. Commonwealth, 12 Va. App. 1023, 1025, 407 S.E.2d 41, 42 (1991) (involving search of dormitory room by school official).

In Mills, 14 Va. App. at 461, 418 S.E.2d at 719, Mills raised a Fourth Amendment challenge to a search conducted by a private individual, Barlow, who was hired by Mills' parents to repair a burglar alarm system in an Illinois home in which Mills resided. Barlow found incriminating evidence in the house and contacted local authorities, who contacted Virginia law enforcement authorities investigating a murder of a police officer. Id. at 462, 418 S.E.2d at 719. After learning of Mills' involvement in the Virginia crime, the local sheriff asked Barlow "'if he was going to go back in the [Mills'] residence, if he would observe and see if [the items he saw initially] were still there.'" Id. Barlow had not completed the job and had to return to Mills' residence. Id. While there, he again saw the incriminating items and reported his observations to the local sheriff, who obtained a search warrant based, in part, on Barlow's information. Id.

Mills contended Barlow acted as an agent of the police in conducting a warrantless search of his parents' house. Id. at 463, 418 S.E.2d at 720. We explained that "[t]he Fourth Amendment acts only as a constraint upon government or state action. . . . Consequently, a private search, no matter how

unreasonable, does not constitute a constitutional violation warranting suppression of the evidence seized." Id.

"Whether a person acted privately or as an agent of the state is a question of fact that must be decided on the circumstances of each case. Resolution of the agency issue 'necessarily turns on the degree of the Government's participation in the private party's activities.'" Id. (quoting Skinner v. Railway Executives' Ass'n, 489 U.S. 602, 614 (1989)). See also United States v. Koenig, 856 F.2d 843, 847 n.1 (7th Cir. 1988) (holding that question is essentially one of fact, based on the particular circumstances, but the factual inquiry is one guided by common law agency principles). Of critical importance, for an agency relationship between a private citizen and the government to exist, both parties must have manifested their consent to that relationship, either expressly or by necessary implication from their conduct. Id. While government knowledge of the private person's conduct obviously is critical, it is not enough, standing alone, to establish the requisite agency. See United States v. Kinney, 953 F.2d 863, 865 (4th Cir. 1992).

Relying on United States v. Feffer, 831 F.2d 734, 739 (7th Cir. 1987), we adopted in Mills "a two-part test for determining whether an individual was acting as an agent of the state while conducting a search." Mills, 14 Va. App. at 463, 418 S.E.2d at 720. Under that test, a trial court looks at "(1) whether the

government knew of and acquiesced in the search, and (2) whether the search was conducted for the purpose of furthering the private party's ends."  Id. at 463-64, 418 S.E.2d at 720 (citing Feffer, 831 F.2d at 739).  "These [two] criteria help focus the trial court's attention on the significance and impact of the government involvement in a search."  Id. at 464, 418 S.E.2d at 720.  The United States Court of Appeals for the Ninth Circuit has referred to the second prong or factor relating to "the purpose of furthering the private party's ends" as "the intent of the party performing" the activity.  United States v. Walther, 652 F.2d 788, 792 (9th Cir. 1981) (challenging search by alleged agent).  However, these two criteria or factors "should not be viewed as an exclusive list of relevant factors." Mills, 14 Va. App. at 464, 418 S.E.2d at 720.  "Other factors include whether the private party acted at the request of government and whether the government offered a reward."  United States v. Smith, 27 F. Supp. 2d 1111, 1115 (C.D. Ill. 1998) (involving search); see also United States v. Garlock, 19 F.3d 441, 443 (8th Cir. 1994) (defendant must show "the government exercised such coercive power or such significant encouragement that it is responsible" for the individual's conduct); Stone v. Wingo, 416 F.2d 857, 860 (6th Cir. 1969) (actions of private party are attributed to the state where "'parties act . . . together in pursuance of some design or in accordance with some scheme'").  The determination of a private party's status,

however, "can only be resolved 'in light of all the circumstances.'" Skinner, 489 U.S. at 614 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971)).

Lawrence received anonymous phone calls, and someone cut her brake lines, causing her to fear for her safety. She explained in detail the state of fear in which she lived and the steps she took to protect herself from this unknown, yet real, threat. Detective Coale provided Lawrence with a tape recorder and blank tapes, and he showed her how to use it. Although he suggested that she initially contact appellant for his immediate reaction to the incident with her car, he expressly advised her not to contact appellant anymore after that time. Moreover, the initial phone conversation yielded no incriminating information.

Lawrence testified that Coale directed her not to contact appellant after her initial call. However, she ignored that admonition and did so anyway. Her testimony clearly reveals her desire to find out who was terrorizing her and to put an end to it and regain a sense of peace.

Applying the above-described factors to the facts of this case, the evidence supports the trial court's determination that Lawrence did not act as an agent of the Commonwealth. The record fails to show that Coale exercised influence or authority over Lawrence or that they worked together to achieve some common goal or plan. Lawrence was motivated by her sense of fear and a desire to identify her unknown antagonist. She

wanted to end the harassment, and to that end, she ignored
Coale's admonitions and independently telephoned appellant and
engaged him in conversations, which she recorded.  Coale never
supervised Lawrence or directed her to do anything.  In fact,
after hearing some early taped conversations, Coale directed
Lawrence not to contact appellant anymore because the
conversations failed to implicate appellant or further the
investigation.  He exercised no control or authority over her
and offered no payment or reward.  Moreover, Lawrence and Coale
did not share a common purpose or plan.

Viewing all of the evidence and applying the relevant
"agency" factors, we hold that the trial court's findings were
not plainly wrong or without evidence to support them.
Accordingly, the trial court did not err in finding that
Lawrence was not a government agent.

### b.  Voluntariness

After a party has satisfied his burden of proving "by a
preponderance of the evidence" that an individual was an agent
for the government, "the burden shifts to the Commonwealth to
establish that the [contested actions] were constitutionally
permissible."  Debroux, 32 Va. App. at 371, 528 S.E.2d at 154
(citing Mills, 14 Va. App. at 464, 418 S.E.2d at 720).

> The Fifth Amendment provides that no person
> shall be deprived of life, liberty, or
> property, without due process of law.  The
> admission of an involuntary confession
> violates due process.  A confession will be

> found to be voluntary only if the government can demonstrate that, under the totality of the circumstances and by a preponderance of the evidence, it was not secured <u>by the government</u> through psychological or physical intimidation, but rather was the product of a rational intellect and free will.

<u>United States v. D.F.</u>, 63 F.3d 671, 679 (7th Cir. 1995) (emphasis added).

"The test for voluntariness derives from federal constitutional law relating to the Fifth Amendment as applied to the States through the Fourteenth Amendment." <u>Rodgers v. Commonwealth</u>, 227 Va. 605, 609, 318 S.E.2d 298, 300 (1984). "Our courts have consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution." <u>Henry v. Commonwealth</u>, 32 Va. App. 547, 551, 529 S.E.2d 796, 798 (2000) (quoting <u>Bennefield v. Commonwealth</u>, 21 Va. App. 729, 739-40, 467 S.E.2d 306, 311 (1996)). Therefore, our constitution provides no greater due process rights than those granted under the Fifth Amendment of the United States Constitution.

"Because only state action may violate a criminal defendant's due process rights, 'coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" <u>Bottenfield v. Commonwealth</u>, 25 Va. App. 316, 323, 487 S.E.2d 883, 887 (1997) (quoting <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986)).

In Connelly, the United States Supreme Court explained that "the sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion. Indeed, the Fifth Amendment privilege is not concerned 'with moral or psychological pressures to confess emanating from sources other than offical coercion.'" 479 U.S. at 170 (quoting Oregon v. Elstad, 470 U.S. 298, 305 (1985)). The Court noted that "[w]hile each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct." Id. at 163-64. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Id. at 164. Thus, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." Id. at 167. Moreover, "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." Id. at 166.

Because the evidence supports the trial court's finding that Lawrence was not acting as a government agent, the Due Process Clauses of the Fifth and Fourteenth Amendments are not implicated. Therefore, if police are not actively involved, a confession obtained by a private party is deemed voluntary under

the Due Process Clause of the Fifth Amendment, thereby obviating a voluntariness analysis. See id. at 167 (holding that coercive police activity is necessary predicate for finding that confession is not voluntary); Commonwealth v. Cooper, 899 S.W.2d 75, 75 (Ky. 1995) (rejecting argument that state constitution or common law required suppression of confession improperly obtained by private party); Darghty v. State, 530 So. 2d 27, 31 (Miss. 1988) (conduct by third party will not vitiate voluntariness confession); State v. Carroll, 645 A.2d 82, 85 (N.H. 1994) (holding that state constitution, which offered greater protection than federal constitution with respect to voluntariness, did not apply absent state action); State v. McCullough, 784 P.2d 566, 568 (Wash. Ct. App. 1990) (rejecting argument that state constitution applied where defendant confessed to victim). Consequently, the trial court did not err by denying appellant's motion to suppress his statements to Lawrence.

## 2. ADMISSIBILITY OF THE STATEMENTS

### a. Admission of Audiotapes/Due Process

Appellant contends the "trial court erred in determining that audiotaped statements made by Mr. Sabo were admissible when they contained erasures, edits and intentional deletions." He argues that the omission of certain portions of the conversations "required the trial court to find the statement involuntary and the tapes inadmissible." Because Lawrence was

not a state actor, the issue of the voluntariness of appellant's confession is not an issue. Accordingly, we do not address this contention.

### b. Foundation for Admission of Tapes

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988). "A proper foundation must be laid for the introduction of all evidence. The burden is upon the party offering real evidence to show with reasonable certainty that there has been no alteration or substitution of it." Horsley v. Commonwealth, 2 Va. App. 335, 338, 343 S.E.2d 389, 390 (1986); see also Charles E. Friend, The Law of Evidence in Virginia § 13-5, at 467 (5th ed. 1999).

Lawrence testified that the tapes contained a true and accurate rendering of the portions of the conversations taped. Although asserting that relevant portions of his conversations with Lawrence had not been taped, appellant conceded on cross-examination that he made the statements contained on the tapes. Lawrence explained that she would use a tape until it was full, then insert another tape. She also acknowledged pausing the recorder during some personal or unimportant conversations and taping over previous conversations when she needed additional tape and had no blank ones. However, there

was no evidence that Lawrence or the police altered or tampered with the tapes. The fact that Lawrence did not tape her conversations in toto and that she taped over other conversations went to the weight and not the admissibility of the tapes. Lawrence was subjected to cross-examination regarding the tapes, and appellant was able to testify regarding statements made by the parties that were not recorded. Moreover, appellant explained in his testimony that Lawrence failed to record threats she made to him that prompted him to falsely admit tampering with her car. Accordingly, the trial court did not err in admitting this evidence.[3]

### 3. DR. BRANTLEY'S TESTIMONY

Appellant contends the trial court erred in refusing to allow the jury to hear the testimony of Dr. Brantley, appellant's psychiatrist. He prefaces his argument by stating that "[t]he trial court's determination of admissibility does not preclude the defendant from proving at trial that those statements were involuntarily made."

At the suppression hearing, the trial court refused to allow Dr. Brantley to testify and render an opinion as to appellant's "mental condition" based on Dr. Brantley's "listening to those tapes." Appellant objected, stating, "it's

---

[3] Appellant also contends admitting the tapes "violated [his] Due Process Rights." Appellant did not make this argument in the trial court; therefore, we will not address it for the first time on appeal. Rule 5A:18.

essential that this expert be permitted to testify at least to the susceptibility of the defendant's being overborne."  The trial court explained:

> I'm not going to let him say I listened to the tapes, and based upon my understanding of them and my listening to them that his will was overborne.
>
> That's the only thing you can be asking about, and I am not going to let him testify about that.  I've already ruled on that.
>
> I will be the one listening to the tapes and making the determination.  And the issue, the testimony of this doctor should center around his visits with the defendant in March and April of 1999, what his condition was and what the treatment was and how that affected his daily life.

Appellant's attorney noted his exception to the trial court's ruling and proffered that Dr. Brantley listened to the tapes and would testify that he

> talked with the defendant about the feelings that the defendant had while that tape was being made, and that the doctor would say with a reasonable degree of medical certainty that the defendant was overborne and that he would admit something that was not true. . . .  The doctor would certinly testify that he was more susceptible to being overborne and to making such an involuntary admission.

The trial court accepted the proffer but indicated "it will not be considered in the matter as evidence."

At trial, appellant testified at length about his personal problems and his mental and emotional condition in 1998 and 1999.  He described the up-and-down, often volatile,

relationship he had with Lawrence.  He indicated that she

continually threatened him when she did not get her way, warning

him that she would contact his ex-wife and their former boss.

Appellant explained that he suffered from depression and anxiety

for which his doctor prescribed Prozac and Xanax.  He denied

doing anything to her car and testified that he only admitted

doing something because of her persistent and relentless

threats.

After appellant's testimony, appellant's attorney proffered

"the direct testimony" of Dr. Brantley from the suppression

hearing.  In addition, he made the following proffer:

> The testimony would be that Dr. Julian
> Brantley saw and treated Kevin Sabo on March
> 12, March 22, March 29, April 7, April 13,
> and April 30 of 1999.
>
> In addition, he saw him and treated him
> on August 16, August 23, August 27.  All in
> 1999.
>
> On the occasion of the August visits,
> Dr. Brantley will testify that he listened
> to the tapes . . . and that based upon his
> earlier treatment and meetings with Mr. Sabo
> in March and his review of the tapes in
> August, he would say with a reasonable
> degree of medical certainty that it is his
> opinion that the admissions were made by Mr.
> Sabo on the tapes that were played before
> the jury as a result of being overborne.
>
> And further, he would say with a
> reasonable degree of medical certainty that
> at the time the conversation occurred and
> the tapes were made that Mr. Sabo was
> susceptible to being overborne by Miss
> Lawrence for the reasons that he articulated

in the testimony and for the reasons made in the proffer.

Because of the trial court's ruling that Lawrence was not a state actor, the issue of the voluntariness of appellant's confession was no longer an issue at trial.  Therefore, Dr. Brantley's opinion testimony about appellant's will being overborne was not relevant.  Moreover, appellant testified in detail about his mental state and indicated that he only admitted wrongdoing to appease Lawrence and because of her serious threats.  Therefore, Dr. Brantley's testimony would also have constituted an improper opinion as to the veracity of a witness.  See Fitzgerald v. Commonwealth, 223 Va. 615, 630, 292 S.E.2d 798, 806 (1982).

Furthermore, appellant chose to limit Dr. Brantley's testimony to rendering an expert opinion of appellant's susceptibility to his will being overborne based on listening to the tapes.  He never asked Dr. Brantley to explain to the jury the clinical conditions from which appellant suffered, his general mental condition, the amount and type of prescription drugs appellant took and the effect those drugs and personal events would have on a person with such a condition.  In other words, appellant did not attempt to attack the weight and reliability of the taped conversation.  Cf. Pritchett v. Commonwealth, 263 Va. 182, 187, 557 S.E.2d 205, 208 (2002) (holding expert testimony about defendant's mental disorder

admissible so long as expert does not opine on the truth of the statement at issue).  Instead, he chose to limit Dr. Brantley's testimony to rendering an expert opinion as to the voluntariness of appellant's statements based on hearing the tapes and speaking with appellant after the fact.

Finally, Dr. Brantley's opinion that appellant's will was overborne would have constituted both an improper comment on the earlier legal determination made by the trial court in the suppression motion and an invasion of the jury's function to determine whether appellant told Lawrence the truth when he made his admissions.

> Expert testimony concerning matters of common knowledge or matters as to which the jury are as competent to form an opinion as the witness is inadmissible.  Where the facts and circumstances shown in evidence are such that men of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and drawing their own conclusions therefrom, the opinion of an expert based upon such facts and circumstances is inadmissible.

Coppola v. Commonwealth, 220 Va. 243, 252, 257 S.E.2d 797, 803-04 (1979), cert. denied, 444 U.S. 1103 (1980).  See also Patterson v. Commonwealth, 3 Va. App. 1, 10, 348 S.E.2d 285, 290 (1986).

Accordingly, the trial court did not abuse its discretion in refusing to allow Dr. Brantley's testimony.

For the foregoing reasons, the judgment of the trial court is affirmed.

<u>Affirmed</u>.

Benton, J., dissenting.

For the reasons that follow I would reverse the conviction and remand for a new trial.

I.

It is now well "recognize[d] that the government can exercise such control over a private actor that a 'private' action can fairly be attributed to the government for purposes of the . . . Fifth Amendment." United States v. Garlock, 19 F.3d 441, 443 (8th Cir. 1994). "Whether a private party should be deemed an agent or instrument of the Government for [Fifth] Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved 'in light of all the circumstances.'" Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 614 (1989). In conducting this analysis, "the ultimate question whether a private person is actually a government agent . . . [is] a question that requires the application of a legal concept (agency) to facts." United States v. Martin, 195 F.3d 961, 963 (7th Cir. 1999). Employing the usual standard, this legal determination of agency is subject to de novo review on appeal. See Ornelas v. United States, 517 U.S. 690, 699 (1996).

The evidence in the record established very clearly that the police initiated the process leading to the recording of

Sabo's conversations with Lawrence, that the police provided Lawrence with a tape recorder so she could record her conversations with Sabo, that the police did so for the purpose of furthering their investigation, and that the police used Lawrence as their surrogate in effecting the ends of their investigation. The trial judge's conclusion that the "minimal" involvement of the police was insufficient to prove Lawrence was an agent of the police is not supported by the evidence.

The evidence proved that the only information the police had concerning the identity of the person who tampered with Lawrence's vehicle was Lawrence's suspicion that Sabo was involved. The police, however, did not contact Sabo. Instead, they decided to use Lawrence as the means of investigating Sabo's involvement. To facilitate the police investigation, the detective instructed Lawrence, who had left her apartment and was staying with her mother, to move back into her apartment. There, the detective supplied Lawrence with a tape recorder, which he had obtained from the police department. He installed the recorder on her telephone and tested it by making calls to the police communication section. Initially, he gave Lawrence six tapes, instructed her in the manner of recording, and told her to record conversations "that would be useful to [the] investigation."

There is no conflict between Lawrence's trial testimony and the detective's. Lawrence testified that the detective knew

Sabo had not contacted her after the accident and that the detective suggested she call Sabo to record his reaction to the accident. The detective testified, "I don't remember whether I told her specifically not to call him or not." After Lawrence had recorded several of her conversations with Sabo from her home telephone and delivered them to the police, the detective gave her an additional recording device for use on her telephone at her place of employment. Thus, the government instigated Lawrence's activities and directed her use of the recorder for the specific purposes of eliciting admissions from Sabo.

This investigation to record Sabo's conversations was the brainchild of the police. Lawrence had not contacted Sabo after her accident and had not been contacted by him. No evidence proved Lawrence was pursuing any private interest. Indeed, she moved back to her apartment, where she had access to her telephone, solely at the suggestion of the detective. In so doing and making the recordings, she was vindicating the interest of the government and functioning in the manner directed by the government.

Furthermore, the police removed any technical barriers that Lawrence may have encountered in locating or installing the equipment. The detective tacitly assured Lawrence that her conduct in recording the calls was lawful. By instructing Lawrence to initiate the first telephone call, the detective strategically set in motion the circumstance that generated

return calls from Sabo to Lawrence.  Cf. Corngold v. United States, 367 F.2d 1, 5-6 (9th Cir. 1966) (noting that the government requested a private person to open a package in a particular person's possession).  Moreover, when the police supplied the recording equipment, installed the device, furnished the tapes, and instructed Lawrence to call Sabo, Lawrence needed only to activate the record button and talk to Sabo.  "The fact that the Government has not compelled a private party to perform [the questioned act] does not, by itself, establish that the [act] is a private one."  Skinner, 489 U.S. at 615.

The notion that Lawrence was not acting as a government agent because Sabo later initiated telephone calls to her is fanciful in view of the detective's initial direction to Lawrence to make the first call to Sabo.  Although the detective told Lawrence to make the call to judge Sabo's reaction, the inevitable and reasonably expected consequence of her telephone call was to initiate a dialogue with Sabo about the event that was the focus of the investigation.  It is of minimal relevance to the inquiry that the detective told Lawrence not to initiate calls to Sabo after she made the initial call.  When Lawrence followed the detective's instruction to place the initial call to Sabo, she set in motion the desired circumstances to cause return calls.  Lawrence already had informed the detective of the nature of her relationship with Sabo and of Sabo's

depression.  Under those circumstances, who initiated the resulting calls after Lawrence made the first call has no bearing on the issue whether Lawrence was a government agent.

Likewise, the notion that Lawrence somehow was acting on a private venture when she recorded the conversations with Sabo is not supported by the evidence.  The detective installed the recording equipment on Lawrence's telephone.  Thus, when Lawrence called to elicit conversation that she could record, she was acting well within the scope of the circumstances the detective set into motion.  The detective made plain his preference for her initiation of the telephone dialogue.  By telling Lawrence he wanted to get Sabo's reaction to the accident, he also undisputedly manifested that this was a means of obtaining incriminating admissions from Sabo.  Indeed, after Lawrence delivered tapes of her conversations with Sabo, the police gave her another recording device to use on the telephone at her place of employment.  We held in Abunaaj v. Commonwealth, 28 Va. App. 47, 502 S.E.2d 135 (1998), that a rape complainant who voluntarily made a telephone call to a suspect, which was recorded by the police, was acting in "compliance with police requests[, which] effectively made her an agent of the police." Id. at 54, 502 S.E.2d at 139.

I would hold that this record contains clear and unequivocal evidence of the government's "encouragement, endorsement, and participation" in Lawrence's activity of

eliciting admissions from Sabo and recording them.  Skinner, 489 U.S. at 615-16.  This evidence was sufficient to prove she was a police agent and to implicate the Fifth Amendment.

## II.

When the evidence proves that a private party has acted as a government agent in procuring evidence, the burden shifts to the government to prove the evidence was obtained by constitutionally permissible means.  Debroux v. Commonwealth, 32 Va. App. 364, 371, 528 S.E.2d 151, 154 (2000).  "It is without dispute that in Virginia the burden is upon the Commonwealth to prove that a confession is voluntary."  McCoy v. Commonwealth, 206 Va. 470, 474, 144 S.E.2d 303, 307 (1965).

> The Fifth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law.  The admission of an involuntary confession violates due process.  A confession will be found to be voluntary only if the government can demonstrate that, under the totality of the circumstances and by a preponderance of the evidence, it was not secured by the government through psychological or physical intimidation, but rather was the product of a rational intellect and free will.

United States v. D.F., 63 F.3d 671, 679 (7th Cir. 1995) (emphasis added).  The ultimate issue whether a statement is voluntary is a legal question.  Miller v. Fenton, 474 U.S. 104, 110 (1985).

The principle is well established that a promise to withhold prosecution in exchange for a confession is the type of

duress that renders a statement involuntary.  See Hammer v. Commonwealth, 207 Va. 135, 147-48, 148 S.E.2d 878, 885 (1966).  Likewise, threats to interfere with an individual's custody of a child as a means to elicit an admission will cause a confession to "be deemed not voluntary, but coerced."  Lynumn v. Illinois, 372 U.S. 528, 534 (1963).  In addition, "sympathy falsely aroused" is a factor in determining whether an induced confession is involuntary.  Spano v. New York, 360 U.S. 315, 323 (1959).

Lawrence testified that she "was after an admission" and worked hard to elicit an admission.  To induce Sabo to make admissions, Lawrence told him she "would not bring in law enforcement if he gave an admission."  Lawrence testified that she was "giving [Sabo] an opportunity" to make an admission by promising not to pursue any criminal action.  The tapes also disclose that Lawrence threatened to publicize her romantic affair with Sabo and threatened that the publicity could cause him to be "disbarred" and to lose his "political appointment."  She promised to withhold her actions if he talked to her and admitted tampering with her vehicle.  Explaining her calls, she testified about her conversations with Sabo as follows:

> I said, if this were to come out that you
> have done an illegal act, this could -- like
> what we're facing right now -- this could
> affect his career.  This could affect his
> political appointment.  This could affect
> his visitation with his daughter.

> Not that I wanted him to tell me that.
> But that if he told me what he had done,
> then I would go away, yes.

When Lawrence engaged in this activity, she knew Sabo had been diagnosed with depression and was taking medication to combat that illness. Pretending to be his confidant, she promised to "do whatever you need me to do to help you with this." She promised Sabo that if he admitted tampering with her vehicle she would not pursue civil or criminal charges. She also promised not to carry through on the threats to damage his personal, employment, or political life. It is self-evident that "[t]he government may not do, through a private individual, that which it is otherwise forbidden to do." United States v. Feffer, 831 F.2d 734, 737 (7th Cir. 1987).

I would hold that this evidence proved that Sabo's admissions were obtained by duress, threats, and sympathy falsely aroused and, thus, failed to prove Sabo's admissions were voluntary.

### III.

I would also hold that the trial judge improperly excluded the testimony of Dr. Julian Brantley. While I agree with the majority opinion that portions of the proffered testimony of Dr. Brantley would have been improper, I disagree that all of Dr. Brantley's testimony was inadmissible.

On the day of trial, the prosecutor challenged whether Dr. Brantley's testimony was relevant to any issue at trial. In

response, Sabo's attorney argued that "[t]he issue for the Court at the suppression hearing was the admissibility of the statements to be made," but that the issue remaining at trial was "the weight that [the statements] should receive." He then informed the judge as follows:

> Dr. Brantley would [testify] that . . . [Sabo] said what he said because he was depressed. He was suffering from acute anxiety disorder.

> And[,] he would testify as to the conditions that are accompanying those disorders, and that [Sabo] was overborne or more susceptible to being overborne than a normal person would have been.

After considering the arguments, the judge made the following ruling:

> I don't think Dr. Brantley can get up here and testify.

> I've certainly heard his testimony from before, that because of [Sabo's] condition what [Lawrence] said overbore his free will and therefore the statements were not made voluntarily.

> I think I've already ruled on that as a matter of law. And I don't think that it's an appropriate subject before the jury.

> He made the statements. Certainly, there's enough on those tapes from what I heard to indicate that it was not necessarily a spontaneous utterance.

During the trial, Sabo's attorney made an additional proffer. The trial judge simply noted the proffer for the record.

Citing Crane v. Kentucky, 476 U.S. 683 (1986), the Supreme Court of Virginia recently reaffirmed the principle that "[w]hile the [trial judge] has the duty to determine whether [a defendant's] confession was voluntary, it is the jury's duty to consider its reliability." Pritchett v. Commonwealth, 263 Va. 182, 186, 557 S.E.2d 205, 208 (2002). Crane explicitly recognized the following principle:

> [R]egardless of whether the defendant marshalled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any questions of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility."

475 U.S. at 689. Thus, the defendant is entitled to have the jury consider circumstances bearing upon the weight to be given to his or her confession and its reliability. Id. In particular, and as pertinent to this case, the Supreme Court noted in Crane that "the . . . psychological environment that yielded the confession can . . . be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." Id.

In Pritchett, the Supreme Court held that a defendant is "entitled to introduce admissible evidence to assist the jury in determining whether the confession was reliable." 263 Va. at 186, 557 S.E.2d at 208. Accordingly, the trial judge erred in ruling that because she had ruled on the issue of voluntariness,

Dr. Brantley's testimony was not "an appropriate subject before the jury."

Furthermore, Dr. Brantley's testimony at the suppression hearing and the proffer of his testimony establish that he was prepared to testify about Sabo's depression and the manifestations of his depression on his ability to function. "Expert testimony is admissible if the area of expertise to which the expert will testify is not within the range of the common experience of the jury." Id. at 186-87, 557 S.E.2d at 208. Portions of Dr. Brantley's testimony were offered particularly to explain to the jury the symptoms of Sabo's illness and to explain that the illness would cause Sabo to exhibit poor judgment.

Dr. Brantley testified at the suppression hearing that he had treated Sabo in March and April of 1999 and that his diagnosis was that Sabo "has a chronic depressive illness which was typical of depression." Dr. Brantley testified that Sabo's "depressive illness was characterized by depressed mood, sad mood, despondent mood, feelings of worthlessness, helpless, hopelessness, a very pessimistic outlook for the future, difficulties maintaining concentration and feeling of -- unrealistic feelings of guilt, extreme feelings of guilt, often unrealistic in this case, as well as suicidal ideation." Dr. Brantley also said that "[a]s a symptom of his overall weakened state of mind, weakened by his depressive illness and anxiety,

Mr. Sabo demonstrated to me impairments in his executive -- what we call ego functioning.  And poor judgement."

In addition, Sabo's attorney proffered at the suppression hearing that Dr. Brantley "would certainly testify that [Sabo] was more susceptible to being overborne and to making such an involuntary admission."  At the trial, he added to the proffer that Dr. Brantley "further, . . . would say with a reasonable degree of medical certainty that at the time the conversation occurred and the tapes were made that Mr. Sabo was susceptible to being overborne by Miss Lawrence for the reasons that he articulated in the testimony and for the reasons made in the proffer."

The testimony of Dr. Brantley concerned a matter that is beyond the normal province of a jury and was offered to explain to the jury Sabo's mental illness.  His testimony would have also given the jury an understanding of how Sabo's illness affected his susceptability to the threats and intimidation.  As the Court held in Pritchett, "an expert may testify to a witness's or defendant's mental disorder and the hypothetical effect of that disorder on a person in the witness's or defendant's situation."  Id. at 187, 557 S.E.2d at 208.

The error in not permitting the expert to testify concerning Sabo's illness was not harmless error.  Although Sabo attempted to describe his illness for the jury, his testimony did not have the same effect of an expert who could more

accurately explain Sabo's mental state and its effect on his functioning. Furthermore, while Sabo's statement and characterization of his illness may have been viewed by the jury as self-serving, Dr. Brantley's testimony and description of the illness would not have been so perceived and could have provided enhanced reliability for the jury to consider. Therefore, I would hold the judge committed reversible error in not allowing portions of Dr. Brantley's testimony.

## IV.

For these reasons, I would hold that Lawrence was acting as an agent of the police when she recorded her conversations with Sabo and, further, that the evidence failed to prove Sabo's admissions were voluntary. In addition, I would hold that the trial judge erred in excluding Dr. Brantley's testimony. Accordingly, I would reverse the conviction and remand for a new trial.