COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges O'Brien, AtLee and Malveaux
Argued at Norfolk, Virginia


LAMONT JOHNSON

                                                    MEMORANDUM OPINION* BY
v.       Record No. 1295-22-1                  JUDGE MARY BENNETT MALVEAUX
                                                         MARCH 12, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

Kelsey Bulger, Senior Appellate Attorney (Virginia Indigent Defense
Commission, on briefs), for appellant.

Craig W. Stallard, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Lamont Johnson ("appellant") of second-degree murder, in violation of

Code § 18.2-32, and two counts of contributing to the delinquency of a minor, in violation of Code

§ 18.2-371.  On appeal, he argues that the trial court erred in: (1) denying his motion to suppress

statements made to police as they were made involuntarily, (2) denying his motion to suppress

statements made to the police when he unequivocally invoked his right to remain silent, and

(3) denying his motions to strike the charges where the Commonwealth failed to prove the corpus

delicti.  For the following reasons, we affirm.

I.  BACKGROUND

In July 2018, appellant lived in an apartment with B.G.[1] and their twenty-month-old

twins.  B.G. also had two teenage children who were staying at their grandparents' house.  On

_____

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] We use initials, instead of the victim's name, to protect her family's privacy.

July 2, 2018, B.G.'s supervisor at work and the grandfather of her teenage children called police and reported B.G. missing after she did not appear at work, missed her son's baseball game, and stopped responding to text messages and phone calls. B.G.'s supervisor testified that even after a few hours, she knew that it was out of character for B.G. to not be at work. Likewise, B.G. never missed her son's baseball games, so the grandfather of her teenage children thought that there was something wrong when she failed to attend one. The grandmother of B.G.'s teenage children testified that B.G. was in daily contact with all of her children. Since the weekend of July 1, 2018, she had not made any contact with any of her family, friends, or colleagues.

When police went to appellant's apartment, appellant reported that around noon on July 1, 2018, B.G. returned home from doing laundry and they argued about paying rent. He stated that B.G. then went upstairs to sleep while appellant remained downstairs with the twins until around 1:00 a.m. the next day, when he left to buy cigarettes from a nearby gas station. Appellant claimed that when he returned, he did not see B.G.

Police subsequently obtained surveillance videos which established that around 1:20 a.m. on July 2, 2018, appellant entered a 7-Eleven store and appeared to be "drenched in sweat." Appellant then went to a gas station and purchased fuel.

On July 3, 2018, B.G.'s vehicle was found abandoned about three miles from her apartment. The vehicle contained B.G.'s purse and wallet, but B.G.'s cell phone was missing. Police later found B.G.'s keys in a dumpster from the apartment complex where she resided with appellant.

Police discovered that on July 1, appellant had used his phone to search the internet for "Suffolk garbage dump," "Suffolk waste disposal," "where does dumpster trash go Virginia," and "where does dumpster trash go Chesapeake." Additionally, appellant's cell phone records showed that on July 2, 2018, his phone moved in a direction consistent with a route between the

apartment where appellant and B.G. resided and where B.G.'s vehicle was abandoned. Police were unable to locate B.G. or her phone.

At 10:41 a.m. on July 28, 2018, Virginia Beach Police Detectives Lanis Geluso and Andre Jerry arrested appellant for four misdemeanor charges of contributing to the delinquency of a minor, based on appellant's previous statements to police that he had left the twins alone at various times on July 2 and 3. Appellant was not told the charges for the arrest. While driving to the police station, the detectives read appellant *Miranda* warnings,[2] and he acknowledged his understanding of his rights.

At 11:25 a.m., Geluso and Jerry removed appellant's handcuffs and placed him in a windowless room, where he was interrogated until 5:02 a.m. the following day. Appellant was actively engaged in discussion with the detectives for approximately 10 hours of the 19 hours he was at the police station. Both audio and video of the interview were recorded and introduced at trial.

During the interrogation, appellant was provided with several breaks to smoke cigarettes. The detectives were with appellant during the smoke breaks and continued to interrogate him during the breaks. Appellant drank water throughout the interview and also used the restroom on several occasions. While on the way to the police station, appellant had told the detectives that he had not eaten, and they offered to stop to pick up breakfast for him. He declined this offer, but was given a snack upon arrival at the police station, and also a snack at 5:00 p.m. and a sandwich for dinner at 5:40 p.m.

Throughout the interview, the detectives' tone with appellant was conversational. However, at one point early in the interview, Geluso raised her voice and told appellant, "She did

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

this to you, Lamont! She did this to you." In addition, later in the interview, Geluso stood up and raised her voice, asking appellant to prove that he was not a monster.

Throughout the interrogation, the detectives told appellant that they were "Team Lamont," that he was not a monster, and that they wanted to help him. They repeatedly told appellant that they believed that he was a good person. The detectives also framed the incident for appellant as either a mistake or premeditated murder, and they repeatedly described the incident as "a mistake."

Regarding a potential future trial, Geluso told appellant, "[H]ardly ever is there any big trial with all of the video show or the interviews played, or the evidence shown because the person has accepted responsibility and they . . . mitigated that by just being honest." When appellant told the detectives that he would be going to prison for a long time, Jerry responded, "I've seen plenty of people that's been accused and that the truth came out that they didn't do it, and they haven't went to jail." Jerry then asked appellant to tell the truth. Appellant also asked the detectives "the cases that you've had similar in the past, what, what are you guys able to do to help?" Jerry responded, "Cooperation, man," and then told him that someone "remorseful" would not be judged on the same basis as someone who had lied.

The detectives also addressed the victim's character and behavior. Throughout the interview, the detectives told him that he had been "pushed" beyond his limits and had "snapped." Geluso stated that B.G. was "a raging bitch that night." The detectives repeatedly stated that B.G. was using cocaine and having sexual relations with another man. They told appellant several times that B.G. was "a monster" and "a bitch." Geluso told appellant that B.G. had decided to "keep these kids" when appellant "never intended for her to get pregnant" and that she "made [his] life hell for years." She also stated that B.G. may have been recording

- 4 -

appellant "to use that to get the kids away from you." She told appellant that B.G. "used you. Sex, insurance, shelter."

The detectives also talked about appellant's family and showed appellant photographs of his children. Geluso told appellant that "the accident, whatever happened between you and [B.G.] does not impact whether" appellant's family could have his children live with them. The detectives stated that if anyone talked to them about the children, "we support 100% of you" and that they were "not in the business of removing kids." They also stated that no one could take the love of appellant's children away from him and that they would not report their conversation to appellant's family.

At 4:25 p.m., after Jerry asked appellant several questions about leaving his children alone in the apartment, appellant stated, "I don't have anything else to say, man. If y'all wanna take me to jail[.] I don't have anything else to say, man." In response, Geluso told appellant, "[T]his is your opportunity, this is your chance." She also reminded him that "you don't have to say anything. You know we already—we went through your rights and you have your rights." She then said that she was "concerned" about appellant "making a really poor decision." Jerry then asked appellant to "make the right decisions" for his children. Jerry then began questioning appellant again about leaving his children alone, and the interview continued.

At about 9:00 p.m., appellant was given a polygraph test in a different room at the police station. He returned to the interview room after the polygraph test was completed at 1:45 a.m., and the interrogation then resumed. The detectives accused appellant of continuing to lie and again asked appellant if the incident with B.G. had been premeditated or an accident.

At 2:26 a.m., the detectives left the interview room. Detective Roberts, who had conducted the polygraph test, came in to talk to appellant alone and appealed to him to tell the truth for his family and because he was a good person. Roberts also told appellant not to "let

[someone else] paint you as some kind of monster." Roberts continued questioning appellant until 2:59 a.m., at which point she left the room.

At 3:00 a.m., Jerry's supervisor, Lieutenant Peter Koepp, entered the interview room with Jerry and told appellant that the detectives "like[d] you so that's why we've been here for so long," but that he would "ratchet it up to the next level." Koepp stated that he had "unlimited funds from the FBI" to investigate appellant for B.G.'s disappearance. Koepp also told appellant that representatives from the television show Dateline had contacted him and were "ready to run with this stuff" because "[e]verybody wants to know what happened to [B.G.]," including the police chief and the mayor. Koepp told appellant that "there's gonna come a time where you're gonna be like damn. I wish I talked to Jerry about some shit." Appellant responded, "Guess it's too late now." After Koepp told him it was "up to you," appellant said that he would "make everything square" if he were allowed a smoke break. Appellant was allowed a smoke break, and when he returned, he apologized to Geluso and hugged her. He then confessed that he had murdered B.G. on July 2, 2018, put her body in a dumpster, destroyed her cell phone, discarded her keys in another dumpster, and moved her car to the location where it was found.

Prior to trial, appellant moved to suppress his confession, arguing that the detectives' coercive interrogation tactics had rendered his confession involuntary and also that he had attempted to exercise his right to remain silent. Following a suppression hearing, the trial court denied the motion. A jury subsequently convicted appellant of second-degree murder and two counts of contributing to the delinquency of a minor. This appeal followed.

## II. ANALYSIS

### A. Voluntariness of Confession

Appellant argues that the trial court erred in denying his motion to suppress his statements made to the police because they were made involuntarily. He contends that the

detectives' use of minimization tactics and deceit, and the conditions of the interrogation itself, rendered his confession involuntary.

"In reviewing the [circuit] court's denial of the motion to suppress, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences deducible therefrom." *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020) (alteration in original) (quoting *Giles v. Commonwealth*, 28 Va. App. 527, 532 (1998)). "For purposes of a Fifth Amendment self-incrimination challenge, '[v]oluntariness is a question of law, subject to independent appellate review.'" *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)). But this Court is "bound by the trial court's subsidiary factual findings unless those findings are plainly wrong." *Robinson v. Commonwealth*, 63 Va. App. 302, 310 (2014) (quoting *Rodriguez v. Commonwealth*, 40 Va. App. 144, 156 (2003)).[3]

"The test for determining voluntariness is whether the statement was the 'product of an essentially free and unconstrained choice by its maker.'" *Secret*, 296 Va. at 226 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). An involuntary statement is one which has been "induced by such duress or coercion that the suspect's 'will has been overborne and his capacity for self-determination critically impaired.'" *Id.* (quoting *United States v. Locklear*, 829 F.2d 1314, 1317 (1987)). "Factors relevant to this determination include 'the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." *Keepers v. Commonwealth*, 72 Va. App. 17, 41 (2020) (quoting *Washington v. Commonwealth*, 43 Va. App. 291, 302 (2004)). "When evaluating the conduct of the police, we 'must consider the

---

[3] Here, the trial court made no factual findings in denying the motion to suppress. Accordingly, on appeal, there are no factual findings to which we must defer.

interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation.'" *Id.* (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)). Additionally, "[c]oercive police activity is a 'necessary predicate' to finding that a confession was involuntary." *Thomas*, 72 Va. App. at 580 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). "Whether . . . a statement was voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances." *Keepers*, 72 Va. App. at 40 (alteration in original) (quoting *Gwaltney v. Commonwealth*, 19 Va. App. 468, 472 (1995)). Further, "[w]hile '[t]he requirement that *Miranda* warnings be given does not . . . dispense with the voluntariness inquiry,' statements made following a *Miranda* warning will 'rare[ly]' be deemed involuntary." *United States v. Holmes*, 699 F. Supp. 2d 818, 836 (E.D. Va. 2010) (second and subsequent alterations in original) (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)).

Appellant first contends that his confession was involuntary because of the detectives' use of coercive "minimization techniques." Although this Court has held that "psychological pressure" is a factor relevant to the voluntariness inquiry, *Terrell*, 12 Va. App. at 291, we have not specifically addressed the use of minimization interrogation tactics. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court noted that interrogation methods designed "to minimize the moral seriousness of the offense" and to offer a suspect "legal excuses for his actions in order to obtain an initial admission of guilt" are potentially coercive. *Id.* at 450-51; *see also United States v. Hunter*, 912 F. Supp. 2d 388, 400-01 (E.D. Va. 2012) (noting that one circumstance to consider in evaluating whether the defendant's statements were voluntary was the detective's "intentional efforts to minimize the seriousness of the defendant's criminal exposure").

In the instant case, appellant challenges the detectives' use of two minimization tactics: (1) the detectives' suggestion that the commission of a crime was understandable and justifiable, which could be considered an implied promise of leniency, and (2) the detectives' presenting appellant with a false choice, as they characterized the crime as either an accident or premeditated, when both alternatives were highly incriminating. However, we reject appellant's assertion that these tactics, viewed in conjunction with the other circumstances of the interrogation, rendered his confession involuntary.

Turning to the first minimization tactic, we find unavailing appellant's argument that the tactic of characterizing the crime as understandable acted to overbear his will. "A confession by an accused may be involuntary if it is obtained by a promise of leniency." *Pugliese v. Commonwealth*, 16 Va. App. 82, 88 (1993). While appellant casts the detectives' efforts to describe the offense as justifiable as an implied promise of leniency, no actual promise of leniency was made to appellant. The detectives in this case told appellant that his actions were understandable because of B.G.'s negative behaviors, but did not explicitly promise him anything in exchange for an inculpatory statement. Because the detectives' actions did not constitute an explicit promise of leniency, we reject appellant's argument that the detectives' sympathetic attitude rendered his confession involuntary. *See Keepers*, 72 Va. App. at 42 (finding confession voluntary when detectives made general but not explicit statements about the defendant benefiting from cooperation as "these implications did not amount to actual promises of leniency"); *see also Hunter*, 912 F. Supp. 2d at 401 (noting that while the federal agent's "repeated assurances that she understood how [the defendant] must have felt and that [the agent] believed the incident was an accident were no doubt persuasive and inducing, nothing in those statements constitutes a *quid pro quo* promise to [the defendant] in exchange for a confession"). Further, even if we treated the detectives' minimization of the crime as an explicit promise of

leniency, a promise of leniency is not sufficient to deprive appellant of his free will. Promises of leniency "have generally been found insufficient to overbear a defendant's free will." *Rodgers v. Commonwealth*, 227 Va. 605, 616 (1984).

We also conclude that, viewed in light of the entire interrogation, the detectives' tactic of portraying the crime as either an accident or premeditated, when both alternatives were incriminating, did not serve to prove that appellant's confession was involuntary. This tactic potentially caused appellant to discount the seriousness of his criminal exposure. However, the detectives' tactic was not so compelling or coercive as to rise to the level of psychological manipulation sufficient to overbear appellant's will. *Cf. id.* at 614-15 (finding the defendant's statements to be voluntary even though the interrogators told him to "'cast aside the devil' and to get 'straight with God'").

As noted above, we review the totality of the circumstances when considering whether statements made to police were voluntary. *See Keepers*, 72 Va. App. at 40. The minimization tactics used here that downplayed the seriousness of the offense and offered appellant excuses for his actions were potentially coercive. However, they must be viewed in light of all of the circumstances of the interrogation, and the use of such tactics, standing alone, does not render a confession involuntary. Here, the minimization tactics were not so unduly coercive as to overbear appellant's free will.[4]

---

[4] On brief, appellant also argues that this Court should condemn the interrogation tactics seen in this case because "[t]he detectives' strategy in this interrogation was apparently to perpetuate misogyny and gendered stereotypes that often underlie domestic violence," citing to *Miller v. Fenton*, 474 U.S. 104 (1985), in support. In *Miller*, the United States Supreme Court recognized that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Id.* at 109. Appellant failed to argue below that the interrogation tactics in this case violated his rights under the Due Process Clause, and thus we do not address this argument on appeal. *See* Rule 5A:18.

We next turn to appellant's argument that the detectives' use of deceit was sufficiently egregious to overcome his will so as to render his confession involuntary. He notes that the detectives stated that they were on his side and wanted to help him, and thus led him to believe that he would have a better outcome if he confessed. He contends that these "false implicit [promises] of leniency" were coercive and deceitful and served to overbear his will.

A false promise of leniency may serve to overcome a suspect's ability to make a free and unconstrained choice. *See United States v. Byers*, 649 F.3d 197, 215 (4th Cir. 2011) (noting that "a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him" (quoting *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009))). In this case, however, we conclude that the detectives' statements suggesting to appellant that they were on his side and wanted to help him did not make his confession involuntary. First, as noted above, the detectives made no explicit promises of leniency to appellant. We find it difficult to find overly coercive police action when there has been no explicit promise of leniency in exchange for a confession. *See Hunter*, 912 F. Supp. 2d at 400 (noting that in the Fourth Circuit, "only certain types of promises, when not kept, will render a resulting confession involuntary. These promises are limited to explicit statements by the questioning official that he will do, or not do, a specific act, in exchange for the confession." (citation omitted)). Second, even if the detectives' statements to appellant were deceitful, in that the detectives did not later help appellant,[5] "a lie on the part of an interrogating police officer does not, in and of itself, require a finding that a resulting confession was involuntary." *Rodgers*, 227 Va. at 616. We conclude that any deceit or implied promise of leniency by the detectives in stating that they supported appellant and would help him were not so coercive as to completely

---

[5] Appellant specifically notes that "[t]he detectives did not testify to their belief that [he] was a good person during the sentencing phase of trial."

- 11 -

overbear appellant's free will. *See United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ("Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises.").

Appellant further argues that the conditions of his interrogation were also coercive. He notes that his interrogation took place in a windowless room and lasted 19 hours and that he was arrested on an empty stomach and was not provided a meal for the next 7 hours. In addition, although appellant was permitted to smoke and go to the bathroom, the detectives accompanied and continued to question him during those breaks. Further, appellant became upset multiple times during the interrogation when he was confronted with photographs of his family.

Examining the conditions of the interview in full, we conclude that, while lengthy, the conditions were not so unduly coercive as to overbear appellant's free will. While a 19-hour interrogation is certainly longer than most, appellant was not deprived of any physical need during the interrogation. He was given a snack upon arrival, and a snack and a meal later. He was continuously provided with water and given multiple opportunities to use the bathroom and take smoke breaks. Appellant also was not questioned continuously throughout the entire 19-hour period. His actual interview sessions lasted, on average, about half an hour to an hour before appellant was allowed some kind of break. Further, as the audio and video recordings reflect, the detectives maintained a calm, even tone throughout the interview, except for a few instances of Geluso raising her voice. There is no evidence that the detectives harmed or threatened to harm appellant in any way if he did not answer their questions, nor was he subjected to unrelenting questioning. Instead, the recordings of the interrogations depict a free-flowing discourse between appellant and the detectives. While emotional at times, appellant seemed eager to continue conversing with the detectives. In addition, the record establishes that

- 12 -

appellant was an adult at the time of the interrogation, that he had completed some college, and that he had prior experience with the criminal justice system (a prior DUI and "a couple domestics").

Overall, there is no indication that the detectives' use of minimization tactics and deceit, together with the physical conditions of the interrogation, served to overbear appellant's will. Rather, based on the totality of the circumstances, we hold that the detectives did not use coercive tactics to obtain appellant's confession. Accordingly, we cannot say that the trial court erred in failing to suppress appellant's confession on the basis that it was involuntary.

### B. Invocation of Right to Remain Silent

Appellant also argues that the trial court erred in denying his motion to suppress his statements made to the police because he unequivocally invoked his right to remain silent.

"Whether a statement sufficiently invokes or waives the right to silence is a legal question we review *de novo*." *Thomas*, 72 Va. App. at 574.

In *Miranda*, the United States Supreme Court held that if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473-74. However, "*Miranda* should not be read so strictly as to require the police to accept as conclusive any statement, no matter how ambiguous, as a sign that the suspect desires to cut off questioning." *Midkiff v. Commonwealth*, 250 Va. 262, 267 (1995) (quoting *Lamb v. Commonwealth*, 217 Va. 307, 312 (1976)). "[A] clear and unambiguous assertion of the right to remain silent or to counsel is necessary before authorities are required to discontinue an interrogation." *Green v. Commonwealth*, 27 Va. App. 646, 653 (1998). A suspect must indicate his desire to remain silent "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement" to be an invocation of his Fifth Amendment rights. *Davis v. United States*, 512 U.S. 452, 459 (1994). "[I]n determining

- 13 -

whether a suspect unambiguously invoked his right to silence, we consider the substance of the statement as well as the context in which it was made." *Thomas*, 72 Va. App. at 574.

In the instant case, about six hours into the interview, appellant told the detectives, "I don't have anything else to say, man. If y'all wanna take me to jail[.] I don't have anything else to say, man." Appellant argues that this statement was a clear and unequivocal expression of his desire to cease the interrogation and remain silent. We disagree, concluding that the statement and the context in which it was made did not constitute an unequivocal invocation.

We first note that appellant's statement itself was not a clear and direct statement unequivocally expressing his desire to remain silent. Instead of saying something akin to, "I do not want to answer any more questions," appellant made a more ambiguous statement to police—"I don't have anything else to say, man." In prior decisions of this Court, we have held that statements such as this did not constitute unequivocal invocations of the right to remain silent. *See Mitchell v. Commonwealth*, 30 Va. App. 520, 526-27 (1999) (finding that "I ain't got shit to say to y'all" did not constitute a sufficiently unambiguous invocation of the right to remain silent); *Green*, 27 Va. App. at 652-54 (finding that "[I don't] have anything more to say" did not constitute an invocation of the right to remain silent).

Further, we do not evaluate an alleged invocation based solely on the wording of the accused's statement, but also in the context in which it was made. Here, the context included five hours of non-coercive conversation with appellant before he made the statement at issue. Appellant had been engaged in a lengthy discussion with the detectives prior to his statement, "I don't have anything else to say." In this context of a lengthy, free-flowing conversation, the detectives reasonably could have understood appellant's statement as not invoking his right to remain silent. Additionally, appellant's statement came after the detectives asked him several questions about his children's whereabouts after B.G. went missing. The detectives reasonably

could have thought that appellant's statement indicated only that he had nothing more to say in regard to their questioning about the location of his children. Accordingly, they reminded appellant of his *Miranda* right to remain silent, with Detective Geluso telling him, "you don't have to say anything" and "we went through your rights and you have your rights."[6] After this reminder, appellant did not state again that he had nothing to say to the detectives; instead, he continued to answer their questions for the next ten hours before confessing to the murder of B.G. Viewed in the context of a lengthy interrogation, during which appellant actively engaged with detectives, his single statement that he did not "have anything else to say" was not a statement that "a reasonable police officer in the circumstances would" understand to be an invocation of his Fifth Amendment right to remain silent. *Davis*, 512 U.S. at 459. Accordingly, because appellant did not unequivocally invoke his right to remain silent, we conclude that the trial court did not err in denying appellant's motion to suppress his statements.

---

[6] The detectives' actions here distinguish this case from the one relied upon by appellant, an unpublished decision of our Supreme Court, *Adkins v. Commonwealth*, No. 180485 (Va. Mar. 28, 2019) (order). In *Adkins*, after approximately 17 minutes of questioning, the defendant stated, "I don't have no more to say to you." Slip op. at 1. Both the officers and the defendant made a couple of additional comments, but the officers ended the interview within 15 seconds of the defendant's statement and left the interview room. *Id.* Shortly after, another detective entered the room and stated that if the defendant did not want to talk to him, that was his "right," but if the defendant did not talk to him, he had "no choice but to go off of what [he is] hearing." *Id.* at 1-2 (alteration in original). The defendant subsequently made statements that he moved to suppress at trial. *Id.* at 2. The Supreme Court held that our Court erred in affirming the trial court's denial of the motion to suppress, finding that the context in which the statement "I don't have no more to say to you" was made supported the conclusion that it was an invocation of the defendant's right to remain silent. *Id.* at 4. The Court noted that the detectives ended the interrogation within 15 seconds of the defendant's statement, indicating that they understood the defendant's statement as an invocation of his right to remain silent. *Id.* Here, in contrast, the detectives were unclear on whether appellant was invoking his right, and thus reminded him of his rights. *Adkins* is further distinguishable in that the invocation came shortly after the interrogation began, while here appellant was engaged in a lengthy back and forth discussion with the detectives prior to making the statement at issue.

C.  Sufficiency of the Evidence

Appellant asserts that the evidence was insufficient to support his convictions because the Commonwealth failed to prove the corpus delicti of the offenses.

When the sufficiency of the evidence is challenged on appeal, "an appellate court views the evidence 'in the light most favorable to the Commonwealth, the prevailing party below.'" *Williams v. Commonwealth*, 71 Va. App. 462, 483 (2020) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)).  "In reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)).  "Thus, we will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without evidence to support it.'" *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Kelly*, 41 Va. App. at 257).

"The corpus delicti rule requires the Commonwealth to introduce evidence independent of an extrajudicial confession to prove that the confessed crime actually occurred—that is, to prove the corpus delicti." *Park v. Commonwealth*, 74 Va. App. 635, 655 (2022) (quoting *Allen v. Commonwealth*, 287 Va. 68, 72 (2014)).  "Only '*slight corroboration* of [a] confession is required to establish corpus delicti beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Allen*, 287 Va. at 74).  The "slight corroboration need not be 'of all the contents of the confession, or even all the elements of the crime.'" *Allen*, 287 Va. at 74 (quoting *Watkins v. Commonwealth*, 238 Va. 341, 348 (1989)).  Indeed, "[t]he confession is itself competent evidence tending to prove the *corpus delicti*, and all that is required of the Commonwealth in such a case is to present evidence of such circumstances as will, when taken in connection with

the confession, establish the *corpus delicti* beyond a reasonable doubt." *Watkins*, 238 Va. at 349.

"The question whether there exists evidence in corroboration of the confession is . . . a question

for the trier of fact." *Jefferson v. Commonwealth*, 6 Va. App. 421, 425 (1988).

"As it relates to murder, 'the *corpus delicti* has two components—death as the result, and

the criminal agency of another as the means.'" *Rams v. Commonwealth*, 70 Va. App. 12, 29

(2019) (quoting *Nicholas v. Commonwealth*, 91 Va. 741, 750 (1895)). "Virginia law . . . clearly

permits proof of the 'death' prong of the *corpus delicti* by circumstantial evidence." *Id.*

Appellant contends that there was insufficient evidence to corroborate his confession,

asserting that the Commonwealth's evidence failed to establish that B.G. was deceased and that

her death was caused by a criminal act. We are unpersuaded by appellant's argument,

concluding instead that the Commonwealth's circumstantial evidence supported both of those

findings.

First, the circumstantial evidence adduced at trial supported the finding that B.G. was

dead. B.G. was reported missing on July 2, 2018, by her supervisor at work and the grandfather

of her teenage children. She had failed to come to work, missed her son's baseball game, and

stopped responding to text messages and phone calls. The evidence indicated that it was out of

character for B.G. to miss work or her son's baseball games. Additionally, prior to her

disappearance, B.G. was in daily contact with all of her children. After her disappearance,

however, she did not make contact with any of her family, friends, or colleagues. Further, B.G.'s

vehicle, which contained her purse and wallet, was found abandoned about three miles from the

apartment she shared with appellant, but her keys were later found in a dumpster that came from

their apartment complex.

Appellant claims that this evidence does not prove that B.G. was dead because there was

no physical evidence to corroborate appellant's confession. However, the lack of physical

evidence in this case is not dispositive as to whether the Commonwealth had evidence independent of appellant's confession to establish that B.G. had been killed. As noted above, the proof of death component of the corpus delicti for murder may be proved not just by physical evidence, but by any type of circumstantial evidence. *Rams*, 70 Va. App. at 29; *see also Epperly v. Commonwealth*, 224 Va. 214, 229 (1982) ("The unlikelihood of [a victim's] voluntary disappearance is circumstantial evidence entitled to weight equal to that of [other] evidence."). Here, B.G.'s disappearance, coupled with her uncharacteristic lack of communication and her leaving behind important personal items, provided circumstantial evidence independent of appellant's confession to satisfy the corpus delicti rule.

Appellant also argues that the Commonwealth's evidence failed to provide sufficient corroboration apart from his confession that B.G.'s death resulted from his criminal act. We again disagree. In this case, police discovered that a day prior to B.G.'s disappearance, appellant had searched the internet for "Suffolk garbage dump," "Suffolk waste disposal," "where does dumpster trash go Virginia," and "where does dumpster trash go Chesapeake." This search history corroborates appellant's statements that he disposed of B.G.'s body in a dumpster. Additionally, appellant's cell phone records showed that on the day of B.G.'s disappearance, his phone moved in a direction consistent with a route to where B.G.'s vehicle was abandoned. This evidence also provides corroboration that appellant was the criminal agent responsible for B.G.'s death.

As noted above, whether there was sufficient corroboration of appellant's confession was a question of fact for the jury, *Jefferson*, 6 Va. App. at 425, and such corroboration need only be slight, *Park*, 74 Va. App. at 655. On appeal, we cannot say that the jury was plainly wrong in

concluding that evidence other than appellant's confession proved that the offenses actually occurred.[7]

### III.  CONCLUSION

We conclude that the trial court did not err in denying appellant's motion to suppress statements made to police because his statements were voluntarily made and because he did not unequivocally invoke his right to remain silent.  Further, the court did not err in denying his motions to strike the evidence because the Commonwealth sufficiently proved the corpus delicti for all of his convictions.  Accordingly, we affirm the judgment of the trial court.

*Affirmed*.

---

[7] Appellant notes that his confession to the murder of B.G. provided the factual basis for the contributing to the delinquency of a minor charges because his statements established that B.G. could not have been home with the children.  Thus, his "corpus delicti argument applies equally to the two misdemeanor convictions, as well as the murder conviction."  Because we find that the circumstantial evidence sufficiently corroborated his confession, we also reject his corpus delicti argument as it relates to his contributing to the delinquency of a minor offenses.